Robert HARRIS, Jr., Appellant,

v.

UNITED STATES, Appellee.

No. 91–CF–279.

District of Columbia Court of Appeals.

Argued Oct. 6, 1992.

Decided April 2, 1993.

Before STEADMAN and KING, Associate Judges, and PRYOR, Senior Judge.

STEADMAN, Associate Judge:

Appellant, Robert Harris, Jr., and his co-defendant, Calvin V. Johnson, were indicted and charged together with several offenses stemming from the death of Paul Moore.[1] A jury trial commenced on December 3, 1990. The jury was given instructions and began deliberating on December 10, 1990. On December 14, appellant was found guilty of second-degree murder while armed, possession of a firearm during a crime of violence, and carrying a pistol without a license. Co-defendant Johnson was found guilty of carrying a pistol without a license. Appellant argues that his convictions should be reversed and remanded for a new trial because events surrounding a jury poll where the twelfth juror disagreed with part of the verdict announced by the foreperson on the second day of deliberations led to a coerced verdict. We disagree and affirm the convictions.

## I.

On Monday, December 10, 1990, the jury in appellant Harris' case was instructed and sent to deliberate at 3:15 in the afternoon. They continued deliberating until 3:50 p.m. the next day, at which point the trial court received a note stating that the jury had reached their verdict. The jury came in and the foreperson was asked if the jury had reached a unanimous verdict in the case of Robert Harris. The foreperson stated that the jury found appellant Harris guilty of second-degree murder, of possession of a firearm while committing a crime of violence and of carrying a pistol without a license. The foreperson was then asked if the jury had reached a verdict in the case of Calvin Johnson. He stated

David Merchant, Public Defender Service, with whom James Klein and Elizabeth Taylor, Public Defender Service, were on the brief, for appellant.

Thomas R. Eldridge, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Elizabeth Trosman and Clifford R. Cronk III, Asst. U.S. Attys., were on the brief, for appellee.

1. Appellant and co-defendant Johnson were jointly charged with second-degree murder while armed in violation of D.C.Code §§ 22–2403, –3202 (Count One), voluntary manslaughter while armed in violation of D.C.Code §§ 22–2405, –3202 (Count Two), and possession of a firearm during a crime of violence or dangerous offense in violation of D.C.Code § 22–3204(b). They were each separately charged with carrying a pistol without a license in violation of D.C.Code § 22–3204(a) (Counts Three and Four).

that it had reached a unanimous verdict of guilty on the same three counts.

Counsel for both defendants requested a poll of the jurors. The court addressed the jury:

TRIAL COURT:

Ladies and gentlemen, as I told you I would, I'm going to poll the jury to insure for the benefit of the parties that your verdict is in fact unanimous. Your foreperson and [I are] going to begin with the case of United States versus Robert Harris, Jr. Your foreperson has announced that you find Mr. Harris guilty of the charge of second-degree murder, guilty of the charge of possession of a firearm while committing a crime of violence, and guilty of the charge of carrying a pistol without a license.

If your own individual verdict agrees with the verdict announced by the foreperson please say yes. If your own individual verdict does not agree with the verdict announced by the foreperson please say no.

The court then asked each juror if he or she agreed with the verdict as announced by the foreperson. The first eleven jurors replied "Yes." The twelfth juror was then polled and the following exchange took place:

JUROR:

Would you repeat the question again?

TRIAL COURT:

My question is whether your own individual verdict in the case of United States versus Robert Harris agrees with the verdict announced by the foreperson. Your foreperson has announced that you find Mr. Harris guilty of the charge of ... (the Trial Court then listed the offenses). Does your individual verdict agree with the verdict announced by the foreperson?

JUROR:

Part of it and not all of it.

TRIAL COURT:

Sorry, it appears that you may not have a unanimous verdict. Ladies and gentlemen, would you please return to the jury room and continue your deliberations.

At approximately 4:00—4:15 p.m., the jury was excused.

Appellant's counsel requested a mistrial arguing that because one juror had isolated herself from the rest of the jurors, and because the court and the other jurors knew of the split, there was too much pressure on her to change her vote. The court recognized appellant's counsel's concerns, noting that "[i]t's a different matter, of course, when the second or third [jurors polled] indicate some disagreement and we send them back and there is no way of knowing how many others might be in that posture." However, by that time—4:30 p.m.—the court had received a second note from the jury stating, "We have reached another verdict. We all agree we cannot reach a unanimous agreement."

The court did not know how to interpret the note and was concerned with the fact that the twelfth juror had only disagreed with part of the verdict—possibly even with the co-defendant's verdict and not appellant Harris' verdict. The court felt that a partial verdict was a possibility, but noted that it had not instructed the jury on whether they could give a partial verdict or not. The trial court said that it would normally send home a jury that had been deliberating this long and have it resume the next day. After further discussion among the parties—at approximately 5:00 p.m.—the trial court sent the jury home saying that it would respond to the note the next day.

The following day, December 12, before the jury came in or began any deliberations, the court entertained suggestions as to how it should proceed. Appellant's counsel argued that any further action—instructions or further deliberations—would be unduly coercive. The court decided to give an instruction based on a suggestion by this court in *Crowder v. United States*, 383 A.2d 336, 342 n. 11 (D.C.1978), where a somewhat similar situation arose. Thus, before the jury began deliberating for the day, the court instructed the jury:

TRIAL COURT:

I have some things that I want to tell you in response to the events [of] yesterday. [] [Y]esterday, your foreperson announced verdicts and we went part of the way through a poll of the jury, but the poll was not completed and your verdict could not be accepted by the Court because it appeared that in part your verdicts were not unanimous. Therefore, your verdict[s] have not been returned and you remain free to return any verdicts on which you can all unanimously agree. Each of you is free to change your mind on any count against either defendant if you decide to do so, but you are also free not to change your mind even if other jurors disagree with you, and you should not do so simply for the purpose of reaching a verdict unless you are persuaded to change based on the evidence and your further discussions with your fellow jurors.

Remember that you are not partisans or advocates for any party in this matter. You are judges of the facts, you must decide the case based solely on the evidence, without prejudice, fear, sympathy, or favor for or against any party. To that end, I remind you that in your deliberations in the jury room your purpose should not be to support your own opinion, but to discuss the case with your fellow jurors with an open mind and to ascertain and declare the truth based on the evidence.

If you will keep that in mind and continue your deliberations I'll be here all day working on other matters.

Later that day, at 4:35 p.m., the court received a note from the jury stating "We still have not reached a verdict." The court decided to take no action and just send the jury home and allow them to continue the next day.[2] The following day, December 13, the jury deliberated without significant communication.[3] At the end of the day, the jury sent a note saying, "We have not reached a verdict as of yet!"[4] The court decided to send the jury home again without further instructions.

The next morning, December 14, the jury began deliberating at approximately 9:45. At 10:35 a.m., the court received a note stating that the jury had come to a unanimous decision in both cases. The jury found appellant guilty on all three counts and co-defendant Johnson guilty on only the count of carrying a pistol without a license. The jury was polled without dissent.

## II.

Superior Court Rule of Criminal Procedure 31(d) states,

When a verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the Court's own motion. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged.

The jury poll is the primary device for discovering doubt or confusion of individual jurors and has long been regarded as a useful and necessary tool for preserving the defendant's right to a unanimous verdict. *Crowder v. United States*, 383 A.2d 336, 340 (D.C.1978). The purpose is to determine with certainty the approval of

---

**2.** Appellant's counsel argued that sending the jury home to continue deliberating the next day was coercive in that the jury had tried three times to tell the court that it could not reach a verdict—once with the poll, once with the note following the poll and lastly with the present note. The court disagreed and stated that the jury knows how to tell the court that it is unable to reach a verdict. The court interpreted the note to say that as of yet they have not reached a verdict, but in time they may be able to.

**3.** In mid-afternoon, the court instructed the courtroom clerk to give the jury a break. The clerk found only a few jurors in the jury room—the others had apparently gone to get their jury service checks. The court gathered the jurors together and instructed them not to leave the jury room without permission in the future.

The court noted that the atmosphere seemed "congenial" and there was no indication of animosity. The court stated that "[t]here is no indication that people are feeling pressured or any other way unhappy with the length of deliberations."

**4.** Appellant's counsel argued that this was further evidence that the jury was deadlocked.

every juror of the verdict and to assure that no juror has been coerced or induced to agree with a verdict with which he dissents. *Id.*

 Super.Ct.Crim.R. 31(d) clearly vests the trial judge with discretion in assessing the impact of a dissenting vote during a poll and reasonable exercise of this discretion should be given proper deference by a reviewing court. *United States v. Brooks,* 137 U.S.App.D.C. 147, 150, 420 F.2d 1350, 1353 (1969). The trial judge is in a much better position to determine whether a dissenter who, after the jury has been sent back to deliberate further, eventually acquiesces to a majority's guilty verdict, in fact reached that decision freely. *Id.* However, if a juror is forced to abandon an honest conviction, the resulting verdict cannot stand. *Smith v. United States,* 542 A.2d 823, 824 (D.C.1988). Thus, "[i]t is settled that even in the potential minefield of a jury poll, the trial court enjoys an appreciable measure of discretion," but reversal must result if a juror was coerced into conforming to the majority's vote. *Ellis v. United States,* 395 A.2d 404, 408 (D.C.1978), *cert. denied,* 442 U.S. 913, 99 S.Ct. 2830, 61 L.Ed.2d 280 (1979). On the other hand, this court will affirm if we can " 'say with assurance that the jury freely and fairly arrived at a unanimous verdict'." *Smith,* 542 A.2d at 827 (citing *Matthews v. United States,* 252 A.2d 505, 507 (D.C.1969)).

 An inquiry into jury verdict coercion is made from the perspective of the jurors. *Id.* at 825. Any alleged coercion must be evaluated in context and with regard to all the circumstances of the case. *Johnson v. United States,* 360 A.2d 502, 504 (D.C.1976). Additionally, appellate review of a trial judge's decision to send a jury back to deliberate after a poll has shown the existence of dissent "requires a careful examination of the factual context in which the decision was made" and reversal of a trial court's decision can only occur

with a finding of abuse of discretion. *Crowder,* 383 A.2d at 341.

 The persuasive impetus inherent in the requirement of unanimity does not constitute coercion; such an impetus exists any time twelve persons are sent into a jury room to deliberate. *Smith,* 542 A.2d at 824. It may be enhanced when a trial judge sends a jury back to deliberate pursuant to Super.Ct.Crim.R. 31(d), gives a *Winters*[5] charge or other instruction in which the trial court brings to the jurors' attention factors relating to the deliberative process so as to encourage agreement, or orders further deliberations after a jury communicates that it is having difficulty agreeing or is deadlocked. Such actions by the court are perfectly acceptable in appropriate circumstances when carried out with care. Indeed, they are part of the normal functioning of the jury system. To release a "hung" jury where a true deadlock does not exist constitutes an unnecessary and undesirable waste of resources, and the trial court has the right and duty to urge a jury to work diligently to reach a fair and freely arrived at verdict if possible. What is impermissible is a situation where the outcome is the result of coercion, i.e., where as a consequence of developments during jury deliberation or trial court action or inaction, one or more jurors feel forced to change their votes from what they individually in fact believe, and thus the verdict is not freely and fairly given.[6] *Smith,* 542 A.2d at 827.

 Where it is alleged that a jury verdict has been coerced, our cases demonstrate that two inquiries should be made. The first inquiry is into the inherent coercive potential of the situation before the court. The second inquiry requires an examination of the actions of the trial judge in order to determine whether these actions exacerbated, alleviated or were neutral with respect to coercive potential. Then the two factors should be viewed together

---

5. Criminal Jury Instructions for the District of Columbia, No. 2.91(B) (3d ed. 1978); *Winters v. United States,* 317 A.2d 530 (D.C.1974) (en banc).

6. Plainly the on-the-spot perception of the trial court as to the existence of coercion can provide significant input.

to assess the possibility of actual coercion on any juror or jurors.

For example, in *Crowder, supra,* the case primarily relied upon by appellant, the situation that presented itself had a great deal of inherent coercive potential. There, the foreman announced that the jury had unanimously reached guilty verdicts on charges of second-degree burglary and grand larceny. The defendant asked for a poll during which the twelfth juror stated that she found the defendant guilty on the burglary charge but specifically stated that he was not guilty on the grand larceny charge " 'because of the lack of evidence'." *Crowder,* 383 A.2d at 341. The trial court instructed the jury in accordance with CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.93.[7] The jury deliberated for forty more minutes before returning a verdict of guilty. *Id.*

The appellant in *Crowder* argued that the trial court erred in requiring further deliberations after the poll revealed the precise numerical (eleven to one) split and the identity of the dissenter. This court stated, *"[o]n the facts of this case, we agree." Id.* at 342 (emphasis in original). The court noted that every jury poll has an element of coercion and then elaborated stating,

> when a lack of unanimity is revealed in open court during the poll by the *last juror* registering a dissent, the potentially coercive impact of requiring the jury to retire for further deliberations is heightened since the numerical split of the jury and the identity of the only dissenter have been revealed in open court. In such a situation, the trial judge should be especially sensitive to

the possibility of undue coercion of the lone dissenter.

*Id.* Thus, the court recognized the inherent coercive potential of such a situation and stressed that it was the trial judge's job to alleviate that potential as much as possible.

In a footnote, the court described what a trial judge should do given these circumstances and found that this situation might have

> justified a further attempt to dissipate the potential coerciveness inherent whenever the twelfth juror's dissent is revealed in open court and the jury is instructed to continue its deliberations. The most obvious danger in such a situation is that the lone recalcitrant juror will conclude that the trial judge is requiring further deliberations in order to eliminate his dissent. To allay any such fears, a trial judge might consider the propriety of supplementing Instruction 2.93 with a comment to the effect:
>
> "It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, *do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction* as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere pur-

7. The instruction given stated,
 Members of the jury, in the polling, one of your members has made an answer which indicates that you have not reached a unanimous verdict with respect to Count 2. For this reason I am asking you to return to the jury room for further consideration of your verdict, and when you have reached a unanimous verdict, you may return to the court. If it's not unanimous, then you continue your deliberations.
 After you return to the jury room, any member is free to change his or her vote on any

issue submitted to you. Each juror is free to change his or her vote until the jury is discharged. So you may return to the jury room.
 *Crowder,* 383 A.2d at 341. This instruction apparently came from the 1972 edition of the CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA. The first sentence of number 2.93 was changed in the 1978 edition to avoid focusing the jury's attention on a dissenting juror. Several other differences appear in the precise language of the 1978 edition as compared to the charge given in *Crowder.*

pose of returning a verdict." [Instruction 2.91 (Alternative A).][8]

*Id.* at 342 n. 11. The court then concluded that the trial judge abused his discretion by not discharging the jury, noting in particular "(1) the inevitable increase in potential coerciveness which occurs when both the numerical division of the jury and the identity of the lone dissenter are revealed in open court, and (2) the degree of assurance with which the single juror dissented." *Id.* at 343.

■ Thus, the *Crowder* type situation—where a twelfth juror in an open court poll clearly dissents on one specific charge—is one of very substantial coercive potential. That situation requires a trial court's utmost attention and careful consideration in its actions to alleviate the potential for coerciveness (although even there, we established no *per se* requirement of a mistrial). The less coercive potential a situation may present, the more discretion a trial court has to handle it without declaring a mistrial. Thus, for example, less inherent coercive potential would be found if the dissenting juror was earlier in line because the precise numerical division of the jury would not be revealed; the juror would not necessarily be the only dissenter and the poll could be terminated without requiring the remaining jurors to commit themselves in open court. *Crowder,* 383 A.2d at 343 n. 14. In such a case, a trial court would have more leeway to handle the situation without abusing its discretion.

Other decisions by this court provide help in determining when the combination of trial judge actions and situational degrees of inherent coercive potential will mandate reversal on grounds of a coerced verdict. In *In re Pearson,* 262 A.2d 337 (D.C.1970), the first juror in a jury poll dissented from the announced "guilty" verdict but the court continued the poll anyway—revealing an eleven to one split. The court sent the jurors back to deliberate further. Fifteen minutes later, without any indication that a verdict had been reached, the trial judge called the jury back in and specifically asked if the split was still eleven to one. He then interrogated the dissenting juror concerning her vote to which she replied, "I'll change it to guilty." *Id.* at 338. This court found that there was no "'useful purpose'" in the trial judge's act of continuing the polling after the first juror dissented and it served only to ascertain the numerical division of the jury, creating a coercive atmosphere. *Id.* at 339. Thus, the trial court's conduct itself created pressure (the continued polling and interrogation of a dissenting juror). Moreover, the open-court split of eleven to one, which would have been unknown but for the judge's decision to continue the poll, presented significant coercive potential. The combination constituted coercion requiring reversal.

Another potentially coercive combination is presented where a jury is apparently deadlocked or having trouble reaching agreement and a trial court decides to give an "anti-deadlock" instruction.[9] The factual context of a case can give rise to a situation where an "anti-deadlock" instruction becomes coercive. In *Smith v. United States,* 542 A.2d 823 (D.C.1988), the trial judge received two notes—one told him of a nine-to-three split in favor of conviction, the next told him the jury stood eleven to one in favor of conviction. The judge, however, asked his law clerk to read the notes and the law clerk reported to the judge and counsel only that the jury was deadlocked. The judge then gave the jury a *Winters* charge and a guilty verdict was returned

---

**8.** The *Crowder* court stated that "[w]hether such a supplemental instruction could have sufficiently reduced the likelihood of undue coercion and thereby validated the trial court's decision to return the jury for further deliberations can only be decided on the particular facts of each case." It then declined to speculate on whether on the facts of that case the supplemental instruction would have cured the error. *Crowder,* 383 A.2d at 342 n. 11.

**9.** Although an "anti-deadlock" instruction, like a *Winters* charge, is appropriate in many situations, it can have coercive potential and thus it "should not be given routinely, but only after careful consideration by the trial judge of the nature of the case and length of the deliberations." *Smith, supra,* 542 A.2d at 825 (citing *Wilson v. United States,* 419 A.2d 353, 356 (D.C. 1980)).

twenty minutes later. *Smith*, 542 A.2d at 824. This court noted that "[w]hen a jury reveals its numerical division and the judge then gives a *Winters* instruction, the potential for coercion is great," and that although the judge took great pains not to learn of the division, he did not inform the jury of this fact. The jury thus reasonably felt the judge knew of its lopsided split for conviction and "*any* pressure by the judge to reach a verdict—such as a *Winters* instruction—[would] be understood by all jurors to be directed at the minority." *Id.* at 825 (emphasis in original). The court concluded that "a *Winters* instruction given after the jury, intentionally or inadvertently, reveals its numerical division is not the kind of measured judicial response that the situation demands," and coercion was found. *Id.* at 826.[10]

Conversely, coercion may be averted where a trial court acts with appropriate precaution, even in a situation with a high degree of inherent coercive potential. For example, in *Wilson v. United States*, 419 A.2d 353 (D.C.1980), after thirty minutes of deliberation, the court received a note from the jury saying that they could not agree. The trial judge asked the foreman if further deliberations would be useful and he replied " 'possible.' " *Id.* at 355. A few hours later, the court received another note indicating that the jury could not agree and the trial judge was informed that one juror had asked to be excused and had attempted to leave. The judge summoned the juror and reminded her of her obligations, stating,

> [n]ow, this is the first time since I have been sitting as a Judge, which is almost sixteen years, that I ever had a juror attempt to walk out of the jury room. I am not going to ask you the reason for it, but you took your solemn oath that you would do your duty as a juror, and that is what is expected of you. I would

like to ask you to go back and make every attempt to deliberate.

*Id.* The court then gave the entire jury a *Winters* charge. Subsequently, the juror sent the judge another note which informed the judge that she was the holdout and that she wanted to be removed or given another day to decide. The judge excused the jury for the day without further instructions. Subsequently, the jury returned a guilty verdict. *Id.*

This court concluded, after evaluating all the circumstances, that the jury verdict was not coerced. The judge's response to the juror's attempt to leave was "reasonable" because her duties were explained to her out of the presence of the other jurors. It was within the trial judge's discretion to give the *Winters* charge even after a second note indicating deadlock, because the jury had deliberated only a short time and because the charge was given before the judge found out about the numerical division. *Id.* at 356–57. Thus, the inherent coercive potential of the situation was not great. When the trial court learned of the numerical division, which increased the inherent coercive potential, the court excused the jury without substantial discourse. This court concluded that this was a "measured response" made without any statements that could be characterized as an overreaction, and found no abuse of discretion.[11] *Id.* at 357.

In *Perkins v. United States*, 473 A.2d 841 (D.C.1984), during a jury poll, juror number ten agreed with the announced verdicts of "guilty" as to the first four counts against both defendants, but disagreed with the "guilty" verdict on count five. The trial judge continued the poll as to only the first four of the seven counts. The next day, the judge read the supplemental instructions suggested by this court in *Crowder*, 383 A.2d at 342 n. 11, *see supra*, and asked the jury to resume deliberations.

---

**10.** *See also Epperson v. United States*, 495 A.2d 1170 (D.C.1985) (coercive to twice give "anti-deadlock" instruction to a hung jury); *Morton v. United States*, 415 A.2d 800 (D.C.1980) (coercive to give a *Winters* charge where jury had deliberated for many hours and juror continued to

serve under "emotional strain" after learning of brother's death).

**11.** The *Wilson* court noted that "[p]erhaps more important than the disclosure [of the numerical division] itself, is the court's reaction to it". *Wilson*, 419 A.2d at 357.

This court held that the eventual jury verdict of guilt was not coerced. The continuation of the poll served a "useful purpose" of finding whether there was unanimity on the first four counts without creating an inherently coercive situation on the fifth count where juror number ten could be isolated in her dissent and the precise numerical division would be known. The case was distinguishable from *Crowder* in these critical respects. Additionally, the judge gave the instruction recommended in *Crowder*—the intent of which is to alleviate coercion. *Perkins*, 473 A.2d at 846–47. Thus, although there was some inherent coercive potential (juror number ten dissenting clearly on one count), the judge responded appropriately and alleviated the problem.[12] *See also Artis v. United States*, 505 A.2d 52, 57–58 (D.C.), *cert. denied*, 479 U.S. 964, 107 S.Ct. 464, 93 L.Ed.2d 409 (1986) (where juror number one dissented only on the guilty verdict for count four and trial judge continued polling on other counts and then ordered continued deliberations, no coercion found).

[10] These precedents identify factors that should be evaluated in determining whether a jury verdict was coerced.[13] Factors that help to establish the existence or degree of inherent coercive potential include (but are not limited to): the degree of isolation of a dissenting juror (or jurors), whether the identity of a dissenting juror (or jurors) is revealed in open court as opposed to in a note, whether the exact numerical division of the jury is revealed, whether the judge knows the identity of a dissenting juror (or jurors) and whether the juror is aware of the judge's knowledge, whether other jurors may feel "bound" by a vote they have announced, and whether an "anti-deadlock" instruction has been given and, if so, whether this has occurred under circumstances where the potential for coercion is high.

■ The determination of the degree of inherent coercive potential must then be combined with an evaluation of how the judge reacted to the situation.[14] Did the judge make affirmative efforts to dispel any coercive potential? Did the judge take a middle course and act (or refrain from acting) in a reasonable and neutral way? Did the judge perhaps compound the problem by actions effectively adding to juror pressure? Did the judge independently create a situation of coercive potential? This process can then aid in the determination of whether the proceedings entailed a coerced verdict.[15]

### III.

■ We now apply the foregoing analysis to the case at bar. The situation itself

---

12. Other decisions support the contention that a trial judge's response is critical in evaluating a coerced verdict allegation. *See Smith v. United States*, 389 A.2d 1356, 1361 (D.C.), *cert. denied*, 439 U.S. 1048, 99 S.Ct. 726, 58 L.Ed.2d 707 (1978) (where judge received two notes from the jury indicating that they were unable to reach a verdict (but did not indicate deadlock) and decided to allow further deliberations without instruction, no coercion found in judge's "neutral actions"); *Lewis v. United States*, 393 A.2d 109, 113 (D.C.1978) (where after more than a day of deliberations the jury sent a note saying it was "hopelessly deadlocked" and revealed an eleven to one split and the court ordered more deliberations, no coercion was found because the judge was careful to not give any instruction that could be construed as coercive to the holdout).

13. We reiterate that in evaluating a given case for jury verdict coercion, one must view the particular facts of that case in light of the total surrounding circumstances. *See Wilson*, 419 A.2d at 356.

14. We reiterate here that a trial judge has discretion in dealing with jury polls and instructions. *See Wilson*, 419 A.2d at 357 (trial judge decision to give *Winters* charge was not abuse of discretion); *Crowder*, 383 A.2d at 341 ("Appellate evaluation of the procedure selected by a trial court pursuant to Rule 31(d) is guided by the abuse of discretion standard.").

15. This analysis does not preclude an inquiry into whether, in fact, there was no coercion. Just because a situation has the potential for coercion does not mean that it actually occurred. Thus, for example, if there is evidence that despite a situation with a lot of inherent coercive potential and an inappropriate response by the judge, in fact the jury was not coerced but rather gave their verdict " 'freely and fairly,' " this should be carefully considered. *See Smith*, 542 A.2d at 827.

had a great deal of inherent coercive potential in that there was a twelfth juror that dissented to at least part of the verdict in open court. Thus, the juror was isolated in her dissent to some degree, the judge and fellow jurors knew it was she that dissented, and the other jurors had already "declared" their views on at least appellant's verdict. The fact that she was the twelfth juror made it clear that the numerical division was eleven to one at least on some of the counts. This clearly implicates the general concerns identified by the *Crowder* court.

However, the facts of this case show that the situation had less inherent coercive potential than the *Crowder* case. Here, the juror was not disagreeing unequivocally with a verdict relating to a single defendant—there were two defendants whose verdicts had been announced. Although the juror was told twice that it was appellant Harris' verdict that was the immediate subject of the poll, it is not entirely clear that she dissented from his convictions as opposed to co-defendant Johnson's, which had not yet been individually polled.[16] Even assuming that she dissented from appellant's verdict, she was dissenting only on an unspecified "part of it" and did not give any reason for her dissent. This is in contrast to the *Crowder* juror who dissented from the verdict as to a specific charge "because of the lack of evidence." *See Crowder*, 383 A.2d at 341. Part of the basis for the *Crowder* court's reversal was "the degree of assurance with which the

single juror dissented." *Id.* at 343. Here there was more ambiguity and less isolation surrounding the dissent in that the twelfth juror's answer did not reveal the specific count or charge from which she dissented nor the specific basis for the dissent. The localized pressure on one specific count that was present in *Crowder* was absent here.

What also distinguishes this case from *Crowder* is that the trial judge's reaction to the situation was decisively different. Here, the trial judge was acutely aware of the potential for coercion in the situation and clearly understood that where it was the twelfth juror who dissented, the potential for coercion was especially high. Immediately after the twelfth juror dissented, the trial judge sent the jury back to continue deliberating.[17] He did not give an "anti-deadlock" instruction nor did he single the dissenting juror out in any way. The jury deliberated for less than an hour before sending the note confirming that they were not in agreement.[18] The trial judge then sent the jury home—giving himself and the parties time to research and determine how best to handle the situation.

The next day, the trial judge asked for suggestions from the parties on how he should proceed, and decided on a course suggested by this court in *Crowder*. He gave an instruction which included the elements of the instruction suggested in *Crowder*[19] that reduce the potential for

---

**16.** Although the foreman announced that the jury had reached three "guilty" verdicts for co-defendant Johnson before the aborted poll, the jury ultimately came back with only one conviction (for the lowest offense) against co-defendant Johnson while appellant's convictions remained unchanged.

**17.** This was one of the trial judge's options under Super.Ct.Civ.R. 31(d), and this court has approved of this response in many instances where a jury poll reveals dissent. *See Artis*, 505 A.2d at 57–58 (trial judge sent jurors back to deliberate on count that juror number one dissented on); *Lumpkin v. United States*, 586 A.2d 701, 703–05 (D.C.), *cert. denied*, —— U.S. ——, 112 S.Ct. 151, 116 L.Ed.2d 116 (1991) (trial judge sent jury back each time juror number one dissented on one of two counts). When a

jury poll reveals dissent, a trial court's decision to send them back immediately to the jury room is appropriate in that nothing is said that could be interpreted as coercive and the trial court and the parties have time to evaluate what further actions should be taken.

**18.** This note was some evidence that there was in fact no coercion of the twelfth juror by the trial judge's order to resume deliberating. The juror did not "cave in" to the pressure of resumed deliberations, on the contrary, she held her ground.

**19.** The instruction suggested in *Crowder* was the second of three paragraphs in CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.91 (Alternative A) (3d ed. 1978), which remains unchanged from the 1972 edition.

coercion.[20] The trial judge's course of action was judicious and taken with the goal of reducing any potential coercion on the twelfth juror.[21] After the instruction, the trial judge acted within his discretion by allowing deliberations to continue even after he had received notes at the end of two of the days suggesting that the jury was having difficulty reaching agreement.[22] Thus, because the trial judge here acted with sensitivity and skill to alleviate coercion when confronted with a situation that created a high level of inherent coercive potential, we find no basis for reversal on the ground of a coerced jury verdict. Accordingly, appellant's conviction is

*Affirmed.*

20. The coercion reducing elements of the instruction suggested in *Crowder* are the statements that (1) deliberations should aim toward agreement, but not at the expense of individual judgment, (2) each juror must decide the case for himself or herself, but only after impartial consideration of the views of others and (3) a juror should not surrender his or her honest conviction merely to return a verdict. The trial judge here conveyed the essence of these points to the jury in his instruction. While the paragraph in the trial judge's instruction beginning "Remember that you are not partisans . . .," see *supra,* might ideally have been omitted in the situation presented here, it did not taint the instruction given to the point of "coercion."

21. Appellant argues that there was no course of action that the court could have taken to adequately alleviate the coercion on the twelfth juror in this situation. We reject the proposition that when a twelfth juror dissents in open court that reversal is warranted *per se.* This was already implicitly rejected in *Crowder* by the fact that the court there suggested the supplemental instruction as a possible cure for situations of this type. *See Crowder,* 383 A.2d at 342 n. 11.

22. Appellant argues that the notes indicated a jury deadlock and that the orders to continue deliberating were coercive in that the jury was led to believe they would have to continue to deliberate endlessly. However, the trial judge decides when a jury is deadlocked, *see Epperson, supra* note 10, 495 A.2d at 1172, and the trial judge here could reasonably interpret the two notes sent at the end of the two days as progress notes and not as signs of deadlock.