**Eniola A. SHOTIKARE, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 97–CF–1702.**

District of Columbia Court of Appeals.

Submitted Sept. 14, 2000.
Decided Aug. 23, 2001.

Michael J. McCarthy, Washington, DC, was on the brief for appellant.

Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Roy W. McLeese, III, John Moustakas, and Ann K.H. Simon, Assistant United States Attorneys, were on the brief for appellee.

Before SCHWELB, FARRELL, and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

The main issue in this appeal is whether the trial judge abused his discretion when he dismissed a juror for threatening a fellow juror and disrupting deliberations, and when he thereafter denied a mistrial and permitted deliberations to continue. The eleven remaining members of the jury found appellant Eniola A. Shotikare guilty on all counts. We hold that the trial judge exercised his discretion properly in excusing the disruptive juror and in allowing the remaining jurors to reach a verdict.

We also hold that the trial judge did not abuse his discretion in denying Shotikare's motion for severance of counts. Although the charges against Shotikare arose from separate incidents, the judge correctly concluded that the evidence of each joined crime would be admissible in separate trials of the others on the issue of identity.

Perceiving no error, we affirm Shotikare's convictions.

## I.

Shotikare was indicted along with his accomplice Babajide Ifelowo on two counts of robbery, one count of armed robbery of a senior citizen, and one count of assault with intent to commit robbery while armed. The two co-defendants were tried separately, albeit by the same trial judge, and each was convicted on all counts. This court recently affirmed Ifelowo's convictions in a published opinion. *See Ifelowo v. United States,* 778 A.2d 285 (D.C. 2001).

The crimes in question are described in detail in *Ifelowo,* at 285–289, and it is unnecessary to repeat their description here. In brief, the government presented evidence of three similar criminal incidents

that took place at the same time of night within a span of nine days in the same general area of the city. In these incidents, two robbers—Shotikare and Ifelowo—drove up, confronted vulnerable pedestrians, threatened them with violence, robbed them and drove off. The victims or other eyewitnesses positively identified Shotikare as one of the robbers in each incident, and Ifelowo as the other robber in the second and third incidents. The robbers drove the same distinctive car on each occasion—a car that, the government proved, belonged to Shotikare's girlfriend. The crimes shared other similarities as well. For instance, witnesses to the first and third incidents observed that one or both of the robbers had a foreign accent, and that the license plate of their car was covered so that it could not be read. There were no major disparities among the three incidents to contradict the impression that they were related and were committed by the same persons.

Finding that the offenses were sufficiently similar that evidence of each would be admissible in a separate trial of the others to prove the identity of the perpetrators, the trial judge denied motions filed by Shotikare and Ifelowo pursuant to Super. Ct.Crim. R. 14 for severance of counts. In the case of Ifelowo, we have upheld that ruling, stating that "despite the differences among the three robberies, the combination of consistent features with respect to them satisfies us that the trial court did not abuse its discretion by concluding that there is a reasonable probability that the same persons committed all

three robberies, and by denying Ifelowo's motion to sever the robbery counts." *Id.*, at 294; *see also* at 296 (Glickman, J., concurring) ("Dissimilarities were minor; overall, the three incidents were strikingly similar and evidently related to each other.").

■ Our decision in *Ifelowo* controls the resolution of the same issue here. Before he ruled on the severance motion, the trial judge took care to ascertain that Shotikare's identification was in genuine dispute with respect to each offense. Hence "identity was a material issue on which the evidence [of each offense] legitimately could be received." *Coleman v. United States*, 619 A.2d 40, 44 (D.C.1993). Shotikare argues that the three criminal incidents were too dissimilar to be mutually admissible in separate trials to prove his identity,[1] but as in *Ifelowo*, we do not agree with that contention. While the robbery incidents were not "identical in every detail," there were "enough points of similarity in the combination of circumstances to make it reasonably probable that the same person committed all of the offenses." *Id.* Indeed, while the existence of the following feature is not essential to sustaining joinder, the three incidents shared at least one "unique characteristic," *Coleman, supra,* that brands them all as the handiwork of the same person—namely, in each case the robbers escaped in the same distinctive vehicle.[2]

■ Shotikare did also argue that the joinder of charges in a single trial was

1. According to Shotikare's trial counsel, "In this particular case we have two robberies, one armed robbery, and the only similar thing is they happened at night."

2. One similarity in the offenses that we noted in *Ifelowo* was not replicated exactly in Shotikare's trial. At Ifelowo's trial, the other robber was identified as the same person (i.e.,

Shotikare) in all three criminal incidents. At Shotikare's trial, however, the other robber was identified as the same person (i.e., Ifelowo) in the second and third incidents, but was not identified at all in the first incident (in which the victim had a good opportunity to observe only Shotikare). We do not regard the distinction as material.

unfairly prejudicial because he would be unable to testify as to one of the incidents and still remain silent as to the others. Upon a sufficient showing of such prejudice, severance of counts may be required even where, as here, the criterion of mutual admissibility of the evidence in separate trials is met. *See Cross v. United States,* 118 U.S.App.D.C. 324, 326, 335 F.2d 987, 989 (1964). But "it is essential that the defendant present enough information—regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of 'economy and expedition in judicial administration' against the defendant's interest in having a free choice with respect to testifying." *Roy v. United States,* 652 A.2d 1098, 1108 (D.C.1995) (quoting *Baker v. United States,* 131 U.S.App.D.C. 7, 25–26, 401 F.2d 958, 976–77 (1968)) (distinguishing *Cross* when appellant failed to make a sufficient proffer). Shotikare failed to make the requisite "convincing showing that he ha[d] both important testimony to give concerning one count and strong need to refrain from testifying in the other." *Id.* Shotikare failed to proffer, and it is not otherwise apparent from the record, what his testimony would have been, or why he needed to refrain from testifying on other counts.

As in *Ifelowo,* therefore, we conclude that the trial judge in this case did not err in denying severance of counts. The charges against Shotikare were properly joined for trial.

**3.** In its entirety, Juror # 4's note, addressed to the trial judge, read as follows:

I have been verbal and physical abuse by one of the female jury during the heated deliberation. Juror # 5 has cursed and

## II.

Shotikare contends that the trial judge abused his discretion by excusing a juror who was allegedly singled out for removal by her fellow jurors because of her unwillingness to abandon her views on the merits and acquiesce in the will of the majority. Shotikare contends that the juror was dismissed to eliminate a deadlock, and that once she was gone the eleven jurors who remained rapidly fell into line and agreed on findings of guilt.

We do not subscribe to Shotikare's contentions; the record does not support the picture that he paints. As we see it, the trial judge was duty-bound to investigate when he received a note complaining that one juror had threatened another with physical violence. The judge conducted a careful and fair inquiry, focused on the allegation in the note, and did not intrude on the jury's substantive deliberations or learn about any jurors' views of the evidence. Based on his inquiry, the judge found that the juror in question had indeed threatened another juror, and that she was intimidating the jury and disrupting its deliberations. The judge properly excused the juror for that conduct, and not because of her views or to break a deadlock.

### A.

During the first day of deliberations, there were three notes from the jury. In the first note, delivered at 12:43 p.m., Juror # 4 reported that she had been subjected to "verbal and physical abuse" from Juror # 5 "during the heated deliberation." Juror # 4 stated that "I feel my life has been threaten[ed]." [3] Before the trial

physically gotten out of her seat to come near me. She was going to demonstrate what she would do to me and pinned her finger at my head. I feel my life has been threaten.

judge could respond to this note,[4] a second note was received at 2:28 p.m. This note, signed by Juror # 1, said that the jury was "deadlocked" and that some "jurors have stopped listening, paying attention or participating any way in the deliberations."[5] The note asked the judge to "instruct on [the] next step." The third note, signed by the jury foreperson (Juror # 2), followed at 3:35 p.m. This note reiterated that the jury was deadlocked and also requested instructions on how to proceed.[6]

Court resumed at 3:37 p.m., and the trial judge discussed the jury notes with counsel. The judge decided to address first the note in which Juror # 4 complained that she had been threatened and abused. Juror # 4 was called into the courtroom. Instructing her not to reveal anything about the deliberations or the views of any juror, the judge asked Juror # 4 what had happened, and whether matters had improved in the three hours since she wrote her note. Juror # 4 stated that Juror # 5 had "jumped up" and threatened to "throw [her] up against the wall." The situation, Juror # 4 said, had not improved; Juror # 5 was "still real violent, real hostile," and Juror # 4 felt "uncomfortable in the room with her." Juror # 4 said that she remained able to participate in jury deliberations, "but I just be glad when it's over

cause I'm kind of nervous now. And I don't trust her at all. And her voice and the way she calling people names, ugly and idiot and uneducated cause I am uneducated."

After hearing from Juror # 4, the trial judge stated that he had heard "a credible allegation of physical intimidation" that he could not ignore. Accordingly, the judge decided to question other jurors carefully about what had happened, while taking pains not to elicit information about the jury's substantive deliberations or any juror's leanings on the merits. The judge proceeded to speak with three jurors before reaching Juror # 5 herself.

Two jurors, the foreperson and Juror # 1, both of whom the judge ultimately credited, corroborated Juror # 4's account.[7] The foreperson reported that Juror # 5 had threatened "bodily harm" to Juror # 4; "she said a lot of things but basically it came down to 'I'll beat the hell out of you,' and that's using euphemisms."[8] According to the foreperson, the altercation had "nothing ... to do with the case" and was unprovoked. Juror # 1, who had signed the second jury note, said that "someone disagreed with [Juror # 5], and she took that personally." After a heated exchange of insults, Juror # 5 "started cursing, using profanity, saying

4. The delay in responding was occasioned by the fact that the trial judge was attending a funeral that morning.

5. The full note sent by Juror # 1 read as follows:
   There is a serious problem with the deliberations we are currently holding. We are deadlocked & it has been stated point blank "that's that." Jurors are presenting their rationale, the reasons for their decision and other jurors have stopped listening, paying attention or participating any way in the deliberations. Please instruct on next step. We are not making any progress.

6. The note stated:

Unfortunately, we the jury are unable to come to a consensus. We need more instructions on how to proceed. Please respond.

7. The third juror, Juror # 3, remarked that she was "nervous" and then said that she had seen no threatening behavior on the part of any juror. She was not questioned further. The trial judge subsequently stated that he did not credit Juror # 3 because he believed that she "was frightened to say anything."

8. The foreperson added that "I had to step between them and so essentially I was in danger as well, but we—we stopped it."

that she was going to throw [Juror # 4] up against the wall. Don't get her started." Juror # 1 also reported that Juror # 5 was still "intimidating" other jurors, herself included.[9]

The judge then inquired of Juror # 5. She acknowledged that she had been in "a heavy argument" with another juror. After being called "hurtful names" and insulted, Juror # 5 said, she threatened the juror by saying "I will bite your A." "Things almost came to a fight," and Juror # 5 told the juror to "leave me alone before I beat your butt." Juror # 5 described herself as "angry and . . . very upset cause the way I'm being treated."[10]

After hearing from Juror # 5, the trial judge decided that it would be unnecessary and undesirable to question the remaining jurors about what happened and its effect on them.[11] The judge found, by what he deemed to be clear and convincing evidence, that Juror # 5 had threatened to assault another juror without adequate provocation. The judge further found that Juror # 5's intimidating behavior was having a "serious effect" on the jury's ability to deliberate, and that at least some jurors were "frightened." Based on these findings, the judge concluded pursuant to Super. Ct.Crim. R. 23(b) that extraordinary circumstances made it necessary to excuse Juror # 5 for just cause and permit the remaining eleven jurors to continue their deliberations without her.

Shotikare's counsel objected unsuccessfully to Juror # 5's removal,[12] and thereafter he moved for a mistrial. Characterizing Juror # 5 as a "dissident" juror, counsel argued that the decision to excuse her put undue pressure on other jurors in the minority to abandon their positions, because those jurors would think that they too would be removed if they continued to hold out against the majority. The trial judge rejected this argument as unfounded; there was no evidence that Juror # 5 was in any minority, her views were unknown, and the reason she was being excused had nothing to do with the merits or the inability of the jury to reach a verdict. Denying the mistrial motion, the judge directed the remaining eleven jurors to continue with their deliberations. In doing so, the judge carefully instructed them that "the juror who was excused was not excused on account of any position that she may have held about the merits of this case." The judge stressed to the remaining jurors that neither he nor the lawyers knew Juror # 5's views,

9. Juror # 1 stated:
   Well, it hasn't gotten to the point where [Juror # 5] has threatened to throw anyone up against the wall but she has said don't talk, I mean she's . . . intimidating other people by saying don't discuss this with me or I, you know, will lose my temper, which, you know.
   * * *
   [S]he's intimidated me, I don't want to sit there, we're supposed to deliberate, I don't want to deliberate with someone who may take anything I say in a, you know, in a manner I think that—other jurors, at least three or four other jurors, I think would feel that they've been, you know.
   THE COURT: Affected or intimidated by the action.
   THE JUROR: Yes.

10. Juror # 5 later added that she had been threatened herself by Juror # 4, whom she accused of raising her hand to her. Juror # 5 demonstrated the gesture for the judge, who found that it was defensive in nature and not threatening to Juror # 5.

11. The trial judge denied the request of Shotikare's counsel that every juror be subjected to voir dire.

12. Counsel opined that Juror # 5 "didn't appear to be a violent type of person," but the trial judge made a different assessment.

and that Juror # 5 "was excused for reasons unrelated to the merits." The judge told the jurors to put Juror # 5's removal "out of your mind and out of your deliberations."

The trial judge next turned to the as yet unaddressed second and third jury notes, which reported that the jury was deadlocked and requested further instruction on how to proceed. Observing that "time has gone by," the judge asked the jury to return to the jury room and consider whether it still wanted him to answer those notes. The jury considered this question, and informed the judge that the outstanding notes "no longer need be addressed." As a consequence, the instructions concerning the excused juror were not coupled with any instructions dealing with the reported deadlock.

By this time it was late in the afternoon, and the jury was released for the day without having deliberated further following the departure of Juror # 5.

The following morning, as the jury reassembled and resumed deliberations, defense counsel renewed his motion for a mistrial. Counsel contended that what had occurred in the jury room did not amount to such an extraordinary circumstance as to allow the court to excuse a deliberating juror for just cause over defense objection. Counsel emphasized that Juror # 4 had stated that she remained able to deliberate, and that the jurors had in fact deliberated for some 2 hours and 52 minutes after sending the first note, and thus were "performing their functions." The trial judge again denied a mistrial.[13]

After deliberating an estimated 35 minutes longer, the jury returned its verdict, finding Shotikare guilty on all counts.

**B.**

■ By law, a jury in a criminal case ordinarily consists of twelve persons, unless the parties agree to a lesser number. However, "[e]ven absent such agreement, if, due to extraordinary circumstances, the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court, a valid verdict may be returned by the remaining eleven jurors."[14] D.C.Code § 16–705(c) (2001); Super. Ct.Crim. R. 23(b). *See generally Salmon v. United States,* 719 A.2d 949 (D.C.1997); *Duvall v. United States,* 676 A.2d 448 (D.C.1996). The authority thus conferred on the court is to be exercised with caution, and only when "extraordinary circumstances" and "just cause" are present. When the occasion arises, two distinct issues are presented for the trial judge to decide: whether to excuse a juror, and if so, whether to require the remaining jurors to continue deliberating or, alternatively, to declare a mistrial. These are discretionary decisions, subject to review for abuse. *See Salmon,* 719 A.2d at 953; *accord, United States v. Araujo,* 62 F.3d 930, 933–34 (7th Cir.1995).

■ When a jury reports that it is deadlocked, the trial judge likewise must decide whether to instruct the jurors to make further efforts to reach a verdict (and if so, how to instruct them), or to declare a mistrial. These decisions too are

---

**13.** Defense counsel also renewed his request to voir dire the rest of the jury in order to "complete the record." The judge denied this request as unnecessary.

**14.** This provision is patterned on Fed. R.Crim.P. 23(b), which omits the requirement

of "extraordinary circumstances," but otherwise employs identical language. Federal cases interpreting the federal rule are a valuable source of guidance in our task of construing the local counterpart.

reviewed for abuse of discretion. *See, e.g., Davis v. United States,* 700 A.2d 229, 230–31 (D.C.1997); *Carey v. United States,* 647 A.2d 56, 61 (D.C.1994); *Winters v. United States,* 317 A.2d 530, 533–34 (D.C.1974). Where, as here, the question of managing a deadlocked jury arises in conjunction with the question of excusing a juror for cause, the trial judge must exercise his or her discretion with especial care. *See, e.g., Morton v. United States,* 415 A.2d 800 (D.C.1980). In that case the jury announced that it could not reach a verdict shortly after one juror had asked to be excused to make funeral arrangements for his brother who had just died. The judge declined to excuse the juror, and he then gave the deadlocked jury a *Winters* instruction. This court reversed the resulting conviction, holding that while the anti-deadlock instruction was otherwise appropriate, giving it after the juror was kept on the jury against his wishes created a substantial risk of a coerced verdict.

■ This case is the reverse of *Morton.* Here, the juror in question was excused, and the resulting jury of eleven was not given an anti-deadlock instruction. Shotikare contends, however, that the dismissal of Juror #5 over his objection and the denial of his motion for a mistrial combined to deprive him of his right—a right recognized under the Sixth Amendment and in Super. Ct.Crim. R. 31(a)—to an uncoerced verdict by a unanimous jury.

■ We entirely agree with Shotikare that a juror may not be excused for the purpose of breaking a deadlock or because of her views on the merits. "[T]o remove a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict." *United States v. Thomas,* 116 F.3d 606, 621 (2d Cir.1997). As the District of Columbia Circuit Court explained, if a court were allowed to excuse a juror on

that basis, "then the right to a unanimous verdict would be illusory":

> A discharge of this kind would enable the government to obtain a conviction even though a member of the jury that began deliberations thought that the government had failed to prove its case. Such a result is unacceptable under the Constitution.

*United States v. Brown,* 262 U.S.App.D.C. 183, 188, 823 F.2d 591, 596 (1987). Indeed, not only the right to a unanimous verdict, but the even more basic right to have a jury rather than the judge decide the defendant's guilt or innocence, would be abrogated if it were permissible for the judge to intervene in deliberations and remove a juror for dissenting from the majority view. The juror in the minority must be afforded a full opportunity to persuade the majority. If consensus is not achievable and the jury hangs, that is a price that must be paid in order to keep the judicial thumb off the scales of a judgment that is constitutionally entrusted to the jury to make. "Thus, when a request for dismissal stems from the juror's view of the sufficiency of the evidence that the government offered at trial, a judge may not discharge the juror: the judge must either declare a mistrial or send the juror back to deliberations with instructions that the jury continue to attempt to reach agreement." *Id.; accord, United States v. Symington,* 195 F.3d 1080, 1085–86 (9th Cir.1999); *Thomas,* 116 F.3d at 624.

■ Ordinarily, of course, there should be no inquiry into the juror's views on the merits of the case. Jury deliberations are presumptively secret. *See Thomas,* 116 F.3d at 618. The trial judge (and counsel) must respect that presumptive secrecy when it becomes necessary to inquire into a report of juror misconduct during deliberations. The judge must take care, moreover, that any inquiry does not itself

"foment discord among jurors" or subtly "influence the work of the jury." *Id.* at 620.

▮▮▮▮▮ Confronted with the task of determining whether to dismiss a deliberating juror for misconduct in the jury room, the trial judge must proceed, therefore, with caution, tact, and respect for the prerogatives of the jury. In probing whether extraordinary circumstances and just cause exist, the judge "may not delve deeply into a juror's motivations." *Brown,* 262 U.S.App.D.C. at 188, 823 F.2d at 596. The jurors' views of the case, the back and forth among them concerning the evidence or the application of the law to the facts, their numerical division on the merits—all such things are off limits. As a result, the record that is generated in the course of the inquiry will be less than exhaustive; and the reasons for the disruption of deliberations may be less than clear.[15] We therefore adopt the standard that "if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror." *Symington,* 195 F.3d at 1087 (emphasis in the original); *accord, Brown,* 262 U.S.App.D.C. at 188–89, 823 F.2d at 596–97; *Thomas,* 116 F.3d at 621–22. In such a case, "the judge must either declare a mistrial or send the juror back to deliberations with instructions that the jury continue to attempt to reach agreement." *Brown,* 262 U.S.App.D.C. at 188, 823 F.2d at 596.

What, then, was the "impetus" for the removal of Juror #5 in this case? Is there any "reasonable possibility" that she was removed because of her views on the merits, or to avoid a deadlock?

We do not agree that Juror #5 was removed for any reason other than the one given: that she had threatened to harm another juror, was continuing by her words and actions to intimidate jurors who were afraid of her, and was thereby paralyzing deliberations. The complaint that was lodged against Juror #5, and that set off the inquiry, focused on her abusive behavior, not on her views or her unwillingness to yield to the majority. For his part, the trial judge focused his inquiry on exactly how Juror #5 had behaved and how it affected the ability of other jurors to fulfill their duties. The judge scrupulously avoided intruding on the secrecy of the jury's deliberations, so that neither Juror #5's nor any other juror's views were sought or exposed. Nor did any juror who was questioned object to Juror #5's position on the merits or refusal to align with the majority. In addition, the questioning of the jurors supported the judge's factual findings concerning Juror #5's behavior and its deleterious effect on other jurors. We defer to the judge's findings, particularly inasmuch as they turned, in part, on his evaluation of the jurors' demeanors. *See Medrano–Quiroz v. United States,* 705 A.2d 642, 649 (D.C. 1997).

It was known, of course, that Juror #5 was in disagreement with at least some of her fellow jurors. The jury had reported itself deadlocked, and it reasonably could be surmised that Juror #5 contributed to the logjam. Although we do not know whether other jurors were on her side of

---

15. We hasten to add that there is no obstacle to a thorough inquiry into the material facts where the basis for discharging a juror is extraneous to the deliberations, for example where the juror is incapacitated by illness or trauma or other circumstances beyond her

control; or, as in *Salmon, supra,* has had a death in her family or comparable shock; or where there is a claim of bias arising from the juror's relationship with a party or witness. *See generally Thomas,* 116 F.3d at 620–21.

the substantive issues, or what her side was, for that matter, we cannot exclude the possibility that Juror # 5's removal contributed substantially to breaking the impasse.[16] However that may be, the deadlock was not the impetus for Juror # 5's removal. More precisely, we may say that there is no reasonable possibility apparent on the record before us that Juror # 5 was dismissed, or that her dismissal was sought, for the purpose of undoing the deadlock, or because of her views on the merits.

■ Furthermore, we are satisfied that in allowing the remaining eleven jurors to continue deliberating, the judge did not coerce a verdict. "Any inquiry into jury verdict coercion is made from the perspective of the jurors." *Harris v. United States*, 622 A.2d 697, 701 (D.C. 1993). The jurors should have felt unpressured in this case. Although the jury had sent two notes reporting itself at loggerheads, the judge did not give an anti-deadlock instruction. *Cf. Morton*, 415 A.2d at 803. Instead, the judge deferred to the jury's decision not to seek further guidance from the court. The jury's numerical split had not been disclosed, and the jurors had no reason to think that the judge knew how they were divided. Defense counsel's concern that other jurors in Juror # 5's camp might be shaken by her dismissal was a legitimate one; but the judge took pains to instruct the jury that Juror # 5's removal had nothing to do with her views on the merits, which were not even known. Those instructions were calculated to eliminate the possibility that jurors who had aligned with Juror # 5 might feel coerced to change their votes. The fact that the jury deliberated only a

short while longer does not mean that any juror felt undue pressure to reach a verdict; that fact is equally consistent with the trial judge's perception that Juror # 5 had frightened jurors from participating in the give and take that is essential to deliberation.

■ We are also satisfied that the trial judge did not abuse his discretion in finding that Juror # 5's threat of physical violence and intimidation of her fellow jurors constituted "extraordinary circumstances" and "just cause" to excuse her. We appreciate that tempers may flare in jury deliberations, and that personality conflicts may arise. Conscientious jurors work through such problems without outside assistance all the time, and they are expected to do so. But the juror misconduct found in this case was not trivial; not to put too fine a point on it, that misconduct constituted—arguably, at least—the criminal offense of threats to do bodily harm. *See* D.C.Code § 22–407 (2001). It often may be appropriate to overlook a threat spoken in the heat of the moment, as passions subside, apologies are made, and there are no lingering effects. In this case, however, the effects persisted, impairing the jury's ability to deliberate without fear. When that happens—when a juror's unprovoked misconduct upsets deliberations and prevents the jury from functioning as a jury must function—there exist "extraordinary circumstances" and "just cause" to excuse the disruptive juror. *Cf. Thomas*, 116 F.3d at 624 ("we do not suggest, much less hold, that a juror's disruptive behavior—his reported 'hollering,' threatening to strike a fellow juror, or feigned vomiting—could not serve as grounds for dismissal"); *United States v.*

---

16. It bears mentioning, though, that no inference can be drawn that Juror # 5 was a lone holdout juror. The jury's second note may indicate otherwise, in fact, referring as it does

to "jurors" (in the plural) who had stopped participating in deliberations. See note 5, *supra.*

*Beard,* 161 F.3d 1190, 1193 (9th Cir.1998) (just cause existed to excuse two feuding, distraught jurors whose conflict was "a major distraction to the deliberations of the jury and seriously distracted their attention from consideration of the case before them").

Shotikare argues that Juror # 4, at least, professed to be able to continue deliberating despite the presence of Juror # 5. "However, '[a] juror's assurance that he or she can render a fair and impartial verdict is not dispositive.'" *Beard,* 161 F.3d at 1194 (quoting *United States v. Egbuniwe,* 969 F.2d 757, 762 (9th Cir. 1992)); *accord, United States v. Barone,* 114 F.3d 1284, 1307 (1st Cir.1997). Certainly Juror # 4's demeanor may well have told another story; she said that she was uncomfortable, did not trust Juror # 5, was nervous, and would be glad when deliberations were over. But even if Juror # 4 was not intimidated and could continue to deliberate, the trial judge also heard from another juror, Juror # 1, who credibly stated that she was intimidated by Juror # 5, and that she thought other jurors were also.

Finally, having properly excused Juror # 5, the trial judge did not abuse his discretion in allowing a verdict to be returned by the remaining eleven jurors rather than declaring a mistrial. We have already concluded that the verdict was not coerced. We see no other reason why a mistrial should have been declared. Whenever a deliberating juror is excused, however properly, there is a potential impact on the outcome, for one voice and one vote are thereby excluded. So long as that potential impact remains unknown to the court and the parties, as it remained in this case, its existence does not without more mandate declaration of a mistrial. That is the balance that is struck by D.C.Code § 16–705(c) and Rule 23(b). It might be incum-

bent on the trial judge to grant a motion for a mistrial where, for example, the judge's inquiry into the conduct of the juror who is excused has revealed the juror's views on the merits or the juror's status as a holdout. For then the decision to remove the juror, however appropriate, would entail influencing the outcome of deliberations in a known direction. Moreover, in such a case the potential for coercion in returning the jury to deliberate would be heightened. The consequent appearance (if not the reality) of a manipulated or coerced jury verdict might make declaration of a mistrial the only acceptable course. *Cf. Harris,* 622 A.2d at 701–705 (discussing when instructions to continue deliberating after jury's numerical division has been disclosed are coercive). In this case, however, neither Juror # 5's views on the merits nor the numerical split of the jury had been revealed. Furthermore, even if Juror # 5's confrontation with other jurors arose in the jury's discussion of the case, there is no indication that the dispute was actually related to the merits. Only the jury foreperson spoke to that issue, and she stated otherwise.

In *Salmon,* 719 A.2d at 955–58, this court addressed at some length the matter of the judge's discretion to refuse to declare a mistrial after excusing a juror under D.C.Code § 16–705(c) and Rule 23(b). Observing that mistrials entail substantial costs and are disfavored in this as in other situations, the court held that we will reverse the decision to deny a mistrial only "'if the decision appears irrational, unreasonable, or so extreme that failure to reverse would result in a miscarriage of justice.'" *Salmon,* 719 A.2d at 956 (quoting *Bragdon v. United States,* 668 A.2d 403, 405 n. 2 (D.C.1995) (per curiam)). That standard for reversal is not met in this case.

### III.

We hold that the trial judge did not abuse his discretion in denying Shotikare's motion to sever counts, in excusing a juror who had threatened and intimidated her fellow jurors, or in denying a mistrial and proceeding with an eleven-person jury. We therefore affirm Shotikare's convictions.

*So ordered.*