Terrance A. FORD, Appellant,

v.

UNITED STATES, Appellee.

No. 98–CF–119.

District of Columbia Court of Appeals.

Argued Jan. 14, 2000.

Decided Sept. 21, 2000.

William T. Morrison, appointed by the court, for appellant.

L. Jackson Thomas, II, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Mary–Patrice Brown, and Peter R. Zeidenberg, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY and SCHWELB, Associate Judges, and BELSON, Senior Judge.

TERRY, Associate Judge:

Appellant was convicted of second-degree murder while armed, assault with a dangerous weapon, and two related firearms offenses. On appeal he argues that the trial court coerced the jury into a guilty verdict when, after the jurors revealed their numerical split, the court instructed them to decide the case "without other extraneous, irrelevant issues coming into play." We affirm.

I

On the afternoon of July 23, 1996, sixteen-year-old Bobby Blackwell had an argument with appellant Ford near a basketball court on 50th Street, N.E. Blackwell left and returned several times, each time threatening to kill Ford (and others),[1] but eventually Blackwell left and did not return. About fifteen minutes later, Ford's cousin and co-defendant, Donyee Bradley, arrived on the scene. He asked Ford how he could let Blackwell threaten him like that and do nothing about it, but Ford did

not respond. Ford and Bradley then went to visit a friend, Delonte Floyd, who lived in a nearby apartment building. After about ten or fifteen minutes, the two of them came out of the building, got into Floyd's Cadillac, and drove off.

A few blocks away, Blackwell and another young man, Charles Dorsey, were riding in Blackwell's car, a red Chrysler. They had stopped to pick up Blackwell's girl friend when Ford and Bradley pulled up alongside the Chrysler. Ford thrust his hand out the right front window of the Cadillac and fired two shots, killing Blackwell and wounding Dorsey in the leg. The Cadillac then drove away up 51st Street.

Several witnesses testified to these events in the course of an eight-day trial. Ford claimed that he had fired the shots in self-defense.

The jury retired to deliberate at 11:35 a.m. on Friday, October 3, 1997. After the luncheon recess, Bradley's attorney requested that the aiding and abetting instruction be reread in order to clarify a point that might have confused the jury. After some discussion, it was agreed that the judge[2] would tell the jury that "in order to find Mr. Bradley guilty under an aiding and abetting theory, you have to find he was present at the time of the shooting." The jury was brought back into the courtroom and was so instructed. Then, before the jury retired for further deliberations, a juror submitted a note to the judge which asked, "Can defendants be guilty of conspiracy individually, i.e., would one be guilty and the other not guilty?"[3] After further discussions with counsel, the judge sent the jury back to the jury room and promised to provide an answer to the question at a later time. Later in the afternoon, however, the substitute judge excused the jury for the weekend, having

---

1. On two of these occasions, Blackwell pointed a gun at Ford's head.

2. Because the trial judge was temporarily absent from the courthouse, another judge filled in for him at this hearing. The trial judge, however, presided over all subsequent hearings.

3. One of the counts of the indictment charged both defendants with conspiracy to commit murder.

decided that the trial judge should respond to the question on Monday morning. On Monday, October 6, the trial judge instructed the jury that "in order to conclude that there was in fact a conspiracy to kill in this case, you would have to conclude that the two defendants did in fact conspire to commit the killing."

At 3:25 p.m. on Tuesday, October 7, the jury sent out another note which read: "We have examined all of the counts that we are permitted to examine at this stage and are deadlocked. It might be helpful if you could expand on the concept of mitigation." Defense counsel requested a *Winters* anti-deadlock instruction,[4] but the judge declined to give one, saying, "I don't think it is appropriate to give the *Winters* instruction at this point because they qualified their deadlocked position with the indication that [if] something more [were] given to them regarding mitigation, they might be able to resolve the case." The judge then sent a written instruction on mitigation to the jury and urged it to "please continue with [its] deliberations."

At 10:00 a.m. on Wednesday, October 8, the jury sent a note stating, "May we please have a dictionary, or dictionary definitions of 'moment' and 'impulse?'" In response, the judge sent back written definitions of these two terms taken from a dictionary.

At 2:05 p.m. on Thursday, October 9, the jury sent two notes. The first one said: "If the jurors agree on all of the elements of a charge, does that constitute a verdict, or must there be a unanimous vote on that specific verdict?" The second note said:

> Your Honor, It's gotten to the point where people are becoming disrespectful and vulgar* (which is unnecessary).
>
> *—Juror # 2 (man) grabbing himself— that action is inappropriate as well as offensive to me and the other jurors. This person would not apologize when asked.

At the end of the day, could you come by and remind the panel that we are adults and should treat each other with respect (refrain from vulgar acts and insults).

This note was signed by Juror No. 11.

With respect to the second note, the trial judge said, "If it looks like somebody has been singled out, it may be a problem, and it sounds to me from these notes—I imagine five days in a room like that, that tensions must be running pretty high anyway." After bringing the jury in, the judge gave the following instruction:

> In reference to the second note that was sent to me, let me just say that we have asked you to deliberate this case, and that should not mean that there be any hostility between you in reference to your deliberations. You have an obligation as adults to be respectful of each other. So you should talk about the case with the spirit of being civil with each other and have those discussions. So I would ask you to please continue with your deliberations . . . .

As for the first note, the judge sent a written response to the jury stating, "What do you mean when you ask, 'If the jurors agree on all of the elements of a charge, does that constitute a verdict?'" The jury answered with another note:

> The issue that divides us is the question of mitigation. We are in agreement of the three elements of manslaughter. Caused death, intent to kill, and was armed. Does this mean that we have reached a verdict for voluntary manslaughter even though we cannot get a unanimous vote on that charge because some jurors insist on the charge of second degree murder while armed?

The judge announced his intention to tell the jurors that they could return a verdict on the lesser charge of manslaughter if, after reasonable efforts, they could not achieve a unanimous verdict on second-degree murder. There is no written instruction to this effect in the record, how-

4. *See Winters v. United States,* 317 A.2d 530 (D.C.1974) (en banc).

ever, nor is there any transcript of such an instruction given orally in court.

On Friday morning, October 10, Juror No. 2 sent the following note to the judge:

> I'm writing this note to inform the Court that there are jurors who only want to consider three (3) of the elements. This small group is unwilling to move from these position[s].
>
> "(*We have jury nullification!*)"
>
> This group is more than willing to "DE–Rail Justice"! This small group in short saying they don't want to send these two (2) *AFRO–AMERICAN* to jail. It's like they have an *interest* in the *outcome*. This small group (seems unwilling to consider "all") repeat "all the EVIDENCE."

The judge told counsel that another note had come out at the same time, but that it revealed the numerical split of the jury, and the judge's law clerk therefore did not show it to him. The law clerk gave this second note back to the juror who sent it and asked that it be resubmitted without any reference to the numerical division. Defense counsel thereupon moved for a mistrial, but the trial judge said:

> [I]t seems to me that it is not appropriate, if this juror is correct, for people to seek to subvert the process by interjecting into the process an attitude that they specifically said they would not bring to bear if they were selected as jurors in this case, because one of those specific questions I asked during the voir dire was whether there was anyone present who felt that they could not be fair and impartial to both sides in a case where the individuals who have been charged with the offense are young black men, and all the jurors who are members of this panel remained silent, and therefore by their silence were indicating that they would not consider this as a factor in their assessment of the case. I don't think it is appropriate to permit jurors to subvert the process by letting themselves become a part of the process and

then doing exactly what they said they would not do.

Before the judge had a chance to respond to the note from Juror No. 2, the jury sent another note saying, "We are still deadlocked. Please help." Moments later, still before the judge could respond to either note, the jury sent yet another note stating, "We want to rescind the note saying we are deadlocked." The judge then instructed the jury as follows:

> No one came forward in reference to any of those questions that were asked [in voir dire] and indicated that you would not be able to do those things that you would be required to do as a judge, and as a judge you have to be fair and impartial to both sides, and as a judge you have an obligation to decide this case based upon the evidence presented *without other extraneous, irrelevant issues coming into play and impacting on how you decide the case.*
>
> I trust that all of you appreciate that oath that you took and that all of you are in fact complying with that oath. So I ask that you please go back and continue your deliberations, and remember that you have an obligation to assess this case based only upon the evidence that was presented during the course of this trial, *without other extraneous, irrelevant issues coming into play.* [Emphasis added.]

Once again defense counsel moved for a mistrial, stating that the court was "chastising" the jury. The court denied the motion, saying, "It's inappropriate if jurors are in fact forming opinions based upon race, and if I was forceful in seeking to cause people—if they are in fact having those opinions based upon those factors, to not do that. If I did that forcefully, that was my intent."

Shortly after 3:00 p.m. that same day, the jury sent a note saying, "We have unanimous verdicts." The jury found Ford guilty of second-degree murder of Blackwell while armed (a lesser included offense of first-degree murder while

armed, with which he was charged), assault on Dorsey with a dangerous weapon (a lesser included offense of assault with intent to kill while armed), and two firearms offenses. Ford was acquitted of conspiracy to kill Blackwell. His co-defendant Bradley was acquitted of all charges. A jury poll confirmed the verdict on each of the counts.

## II

Ford raises only one argument on appeal. He contends that the trial court coerced the jurors into returning guilty verdicts when, after they revealed their numerical split, it instructed them to decide the case "without other extraneous, irrelevant issues coming into play."

We set forth our standard of review in *Harris v. United States*, 622 A.2d 697 (D.C.1993), *cert. denied*, 510 U.S. 1129, 114 S.Ct. 1097, 127 L.Ed.2d 410 (1994):

> Where it is alleged that a jury verdict has been coerced, our cases demonstrate that two inquiries should be made. The first inquiry is into the inherent coercive potential of the situation before the court. The second inquiry requires an examination of the actions of the trial judge in order to determine whether these actions exacerbated, alleviated, or were neutral with respect to coercive potential. Then the two factors should be viewed together to assess the possibility of actual coercion on any juror or jurors.

*Id.* at 701–702 (citation omitted).[5] Then, after extensively reviewing the relevant case law, we outlined several factors to be considered in any determination of whether a jury verdict was coerced:

> Factors that help to establish the existence or degree of inherent coercive potential include (but are not limited to): the degree of isolation of a dissenting juror (or jurors), whether the identity of a dissenting juror (or jurors) is revealed in open court as opposed to in a note, whether the exact numerical division of the jury is revealed, whether the judge knows the identity of a dissenting juror (or jurors) and whether the juror is aware of the judge's knowledge, whether other jurors may feel "bound" by a vote they have announced, and whether an "anti-deadlock" instruction has been given and, if so, whether this has occurred under circumstances where the potential for coercion is high.

*Id.* at 705; *accord, Benlamine v. United States*, 692 A.2d 1359, 1363 (D.C.1997); *Davis v. United States*, 669 A.2d 680, 683 (D.C.1995). This court has also made clear that if a jury reveals its numerical split and the trial court then gives a *Winters* instruction, there is "great potential for coercing a verdict." *Benlamine*, 692 A.2d at 1363 (citing *Davis*, 669 A.2d at 684); *see Smith v. United States*, 542 A.2d 823, 825 (D.C.1988) (citing *Blango v. United States*, 335 A.2d 230, 233 (D.C.1975)).

■ In this case the jury revealed its numerical split in a note that it sent to the judge. The judge never saw the note because it was intercepted by his law clerk, and its contents were not disclosed to the judge. Nevertheless, even though the judge did not actually know how the jury was divided, the jury had no way of knowing whether the judge knew or not. Therefore, since the judge did not tell the jury that he did not read the note, the jury may have "reasonably assume[d] that the judge had read its note[ ]...." *Smith*, 542 A.2d at 825.

Regardless of what the jury thought, however, the judge never gave a *Winters* instruction after the jury's revelation of its numerical division. He did express his intention to give a "reasonable efforts" instruction, *see Jones v. United States*, 544 A.2d 1250, 1252–1254 (D.C.1988), but there is no record of such an instruction actually

---

5. We also said in *Harris:* "An inquiry into jury verdict coercion is made from the perspective of the jurors." 622 A.2d at 701.

being given. The fact that no *Winters* instruction was given distinguishes this case from *Benlamine* and *Smith*. The judge told the jury to consider only the evidence presented and not to base its verdict on "other extraneous, irrelevant issues," but he never instructed the jurors to resolve their deadlock and decide the case.

█ Because the judge never gave a *Winters* instruction, there was no real risk of coercion here. Had the judge told the jurors that they had to decide the case after they revealed their numerical split, the risk of coercion would have been high, since the dissenting jurors would feel as though they were being singled out. But that did not happen. What the judge did was to remind the jurors to abide by the oath that they had sworn at the beginning of the trial. It is entirely possible that some jurors may have felt singled out by the judge's admonition to consider only the evidence because, according to the note from Juror No. 2, they were refusing to return a guilty verdict on account of the defendants' race. But if that was their view, the judge had a duty to dispel it and to take all reasonable steps to eliminate any possibility of jury nullification.

Inasmuch as no juror has a right to engage in nullification—and, on the contrary, it is a violation of a juror's sworn duty to follow the law as instructed by the court—trial courts have the duty to forestall or prevent such conduct, whether by firm instruction or admonition.... [I]t would be a dereliction of duty for a judge to remain indifferent to reports that a juror is intent on violating his oath. This is true regardless of the juror's motivation for "nullification," *including race, ethnicity, or similar considerations.*

*United States v. Thomas,* 116 F.3d 606, 616 (2d Cir.1997) (emphasis added); *see United States v. Sepulveda,* 15 F.3d 1161, 1190 (1st Cir.1993) (trial judge "may instruct the jury on the dimensions of their duty to the exclusion of jury nullification"),

*cert. denied,* 512 U.S. 1223, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994); *United States v. Krzyske,* 836 F.2d 1013, 1021 (6th Cir.) (although jury has a " 'right' to reach any verdict it wishes," court has a "duty ... to instruct the jury only as to the correct law applicable to the particular case"), *cert. denied,* 488 U.S. 832, 109 S.Ct. 89, 102 L.Ed.2d 65 (1988). "A jury has no more 'right' to find a 'guilty' defendant 'not guilty' than it has to find a 'not guilty' defendant 'guilty'...." *United States v. Washington,* 227 U.S.App. D.C. 184, 189, 705 F.2d 489, 494 (1983). Because considering the race of any defendant in rendering a verdict is generally contrary to law and contrary to every juror's duty, the judge's instruction to consider only the evidence "without other extraneous, irrelevant issues coming into play" was a proper instruction. *See Watts v. United States,* 362 A.2d 706, 711 n. 5 (D.C.1976) (en banc) ("it cannot be suggested that because a jury in fact may reject the instructions of the judge, it is erroneous to charge that its duty is to accept the law as the court states it").

█ Finally, Ford asks us to establish rules as to how judges should respond to jury notes. We decline to do so. Every situation involving a jury is different, and it is precisely for that reason that we must refrain from laying down fixed rules to govern each and every case.

█ In summary, we hold that there was no inherently coercive situation in this case, and that the potential for jury coercion was slight or non-existent. Although some of the jurors may have felt singled out by the judge's forceful admonition to consider only the evidence, they were not told to resolve any deadlock, but simply to follow their sworn duty and act according to law. Telling jurors to do what they have already sworn to do is not coercion. The judgment of conviction is

*Affirmed.*