**Gene S. DOWNING, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 01–CF–1357, 01–CF–1603.**

District of Columbia Court of Appeals.

Argued March 8, 2005.
Decided July 19, 2007.

---

M. Elizabeth Kent, Washington, District of Columbia, appointed by the court, for appellant.

Katherine M. Kelly, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and John R. Fisher, Assistant United States Attorney at the time the brief was filed, and James S. Sweeney, Assistant United States Attorney, were on the brief, for appellee.

Before WASHINGTON, Chief Judge,[*] GLICKMAN, Associate Judge, and TERRY, Senior Judge.[**]

WASHINGTON, Chief Judge:

After two jury trials, appellant Gene S. Downing ("Downing") was convicted of several charges related to the kidnapping and murder of Vidalina Semino ("Semino") in May 2000. After the first trial, over which the Honorable Lee Satterfield presided, Downing was convicted of conspiracy to commit armed robbery,[1] armed robbery,[2] armed carjacking,[3] armed kidnapping,[4] possession of a firearm during a crime of violence ("PFCOV"),[5] and carrying a pistol without a license ("CPWL").[6] The jury was unable to reach a unanimous verdict on three murder charges and a mistrial was granted as to those charges. A new trial, presided over by Judge Robert Richter, was held on the murder charges, and Downing was convicted of first-degree premeditated murder while armed,[7] and two counts of first-degree felony murder predicated on robbery and kidnapping.[8]

On appeal, Downing contends that his convictions in the first trial should be reversed because: (1) the evidence was in-sufficient to support his conviction for car-jacking while armed; (2) the trial court erred in admitting the videotaped statement of Downing's co-defendant; and (3) the jury verdicts rendered were coerced. With respect to the subsequent trial, Downing contends that: (1) the evidence was insufficient to support his conviction for first-degree premeditated murder; (2) the evidence was insufficient to support his two convictions for felony murder; and (3) his convictions for felony murder merge. We affirm Downing's convictions in both trials, but remand the case for resentencing in a manner consistent with this opinion.

## I.

On May 5, 2000, Downing, along with Allen Cade ("Cade"), Robert Moody ("Moody"), and Leon Butler ("Butler"), robbed and kidnapped Ms. Semino as she left her job at the Omni Shoreham Hotel in Northwest Washington, D.C. After forc-ing Semino into the trunk of her car, the men drove to Southeast Washington, D.C., where Moody shot her to death in a wood-ed area near T Street. Originally, Butler was the only suspect arrested in relation to Semino's death. However, shortly after he

---

[*] Chief Judge Washington was an Associate Judge of the court at the time of argument. His status changed to Chief Judge on August 6, 2005.

[**] Judge Terry was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

1. In violation of D.C.Code § 22–105a (1981), recodified at D.C.Code § 22–1805a (2001).

2. In violation of D.C.Code §§ 22–2901, –3202 (1981), recodified at D.C.Code §§ 22–2801, –4502 (2001).

3. In violation of D.C.Code §§ 22–2903, –3202 (1981), recodified at D.C.Code §§ 22–2803, –4502 (2001).

4. In violation of D.C.Code §§ 22–2101, –3202 (1981), recodified at D.C.Code §§ 22–2001, –4502 (2001).

5. In violation of D.C.Code § 22–3204(b) (1981), recodified at D.C.Code § 22–4504(b) (2001).

6. In violation of D.C.Code § 22–3204(a) (1981), recodified at D.C.Code § 22–4504(a) (2001).

7. In violation of D.C.Code §§ 22–2401, –2404.1(b)(1)(4)(8), –3202 (1981), recodified at D.C.Code §§ 22–2101. *See* 22–2104, –2104.01(b)(1)(4)(8), –4502 (2001).

8. *Id.*

was arrested, Butler implicated Downing, Cade, and Moody in Semino's murder, and they were all indicted for murder as well as the other related offenses. Butler entered a pre-indictment guilty plea and was not tried with the other men. Moody's case was severed because he wanted to pursue an insanity defense.[9] Downing and Cade were tried together for Semino's murder.

At the first trial, Butler testified that the four men had wanted initially to rob someone in a house in Woodley Park, but had abandoned that plan and instead focused their attention on robbing a pedestrian. The men stood watch at a bus stop until Butler spotted Semino at 28th Street. After Butler got Cade's gun, Butler and Cade approached Semino while Downing and Moody stayed behind. Butler knocked Semino to the ground, asked her to "give the money up," and took her purse. Cade took her car keys and entered the vehicle while Butler forced her into the backseat at gunpoint.

Cade drove the car around the block and picked up Downing and Moody on 28th Street. Downing entered the front passenger seat and Moody entered the backseat, such that Semino sat between Moody and Butler. Butler had already searched Semino's purse and removed her ATM card, and Downing searched the purse after he sat in the vehicle. Butler testified that all the men helped to stuff Semino into her trunk at some point after driving away. The parties stopped at a gas station and paid using money from Semino's purse, at which point Moody noticed that Semino's legs were visible from outside the car. This made Butler nervous, and Moody proposed to kill Semino because she had seen their faces. Downing suggested that the four shoot Semino in a wooded area near T Street, Southeast, and, with Butler, gave Cade directions to that location.

The men drove to the wooded area, exited the vehicle and opened the trunk. Downing and Cade asked Semino for her PIN, which she provided. The four pulled her from the trunk and walked her into the wooded area. Semino broke away and Butler chased her, caught her, grabbed her by the arm, and pulled her back to the others.[10] The group stood within four to five feet of each other when Moody aimed at Semino and pulled the trigger. The gun malfunctioned, and Moody pulled the trigger again. The gun fired, hitting Semino in the chest. Moody fired another fatal shot at Semino's chest, and she fell onto her face. The four men ran up 22nd Street and west to 16th Street.[11]

Albert McManus ("McManus"), a friend of Downing, testified as a government witness in the first trial. According to McManus, on May 6, the day after the murder, Downing told him that he had used an ATM card that belonged to a woman who had been fatally shot in the woods near Good Hope Road. Downing also told him that the lady was transported to the woods by car. Roughly two months later, McManus visited Downing's apartment on

9. Ultimately, Moody pleaded guilty to first-degree premeditated murder.

10. Signe Douglas, a resident whose apartment building abutted the lot, testified that she saw the men enter the woods, push the girl, and later heard someone whisper, "get her, get her." Off-duty Officer Jose Bimbo testified that he later saw four men running from the wooded lot at about the same time.

Officer Richard Griffin responded to the scene and fingerprinted Semino's car, recording eighteen latent prints on the vehicle exterior, two of which matched Downing's left palm print.

11. Dr. Jacqueline Lee testified that Semino died because of the gunshot wounds, and that she had a broken arm and other bruises and abrasions consistent with a physical struggle.

Marcy Avenue in Oxon Hill, Maryland, and saw a gun in Downing's closet, and remembered that Butler had tried to sell him the same gun in the spring of 2000. Finally, the government presented a videotaped interview with Cade during which he recounted the events that Butler had previously described.

After the government completed its case, Cade testified in his own defense. He testified that he carried a nine millimeter handgun that he gave to Butler on May 5. After Butler knocked Semino down and forced her into the backseat, Cade confirmed that he then drove Semino's car to pick up Moody and Downing and, ultimately, to the Southeast lot. Cade testified that Moody first proposed killing Semino, but that Cade and Downing objected. The four discussed whether or not to kill her for most of the ride, which lasted over an hour. After arriving, "somebody" removed Semino from the trunk, and she subsequently escaped. Moody said, "Get her, get her." Cade and Downing, who allegedly stood together about forty feet from Moody, Butler, and Semino, ran when they heard gunshots. Within fifteen minutes, the two went to the bank where Downing used Semino's ATM card to withdraw $200 and gave half to Cade. They then took a bus towards their homes and used the card again before retiring for the evening.[12] Downing did not testify and did not present any other defense evidence.

After closing arguments were presented and the jury was instructed, the jury began its deliberations. Sometime thereafter, the jury revealed to the court that it had reached a partial verdict. The jury

also sent the court another note that stated:

> We believe that the jury is hung [on some of the counts] because at least one juror refuses to apply the law and disagrees with the charges that were brought against the defendant. We believe there is no disagreement regarding the facts or the evidence. What should we do?

This note was signed by all the jurors except Juror 773. At around the same time, the court received another note signed only by Juror 773, stating "Juror 773 wishes to express her rights as a juror." Appellant moved for a mistrial for the counts for which the jury had not reached a verdict and requested that the court not give an anti-deadlock instruction because it would be coercive because of the eleven to one split.

The court discussed the notes with the parties, including a potential jury instruction, and stated that it would not give a anti-deadlock instruction. In response to an inquiry by the court, the jury stated that it wished to return a verdict. The jury gave a partial verdict and found Cade guilty of all the non-murder felonies and Downing only guilty of conspiracy to commit armed robbery. The jury indicated that it had not reached a unanimous verdict on any of the remaining charges. The court reminded the jury never to reveal its numerical split, because it did not want to appear that it was attempting to coerce the jury by giving an instruction to the jury. The court further instructed the jury, and again stated that it did not intend to coerce the jury:

---

12. Detective Pamela Reed testified that Butler used Semino's Visa card to buy time from a dating service and to check a phone message. After Butler implicated Downing, Reed executed a search warrant for Downing's resi-dence, seizing a shirt that matched an ATM security photo admitted into evidence. Bank records also recorded $200 and $80 withdrawals at 1:48 A.M. and 2:17 A.M., respectively.

I'm asking the jury to continue their deliberations in this case with respect to the other charges in this case. And I would indicate and remind the jurors that the verdict, and this is to all the jurors, must be based on the law and the evidence that was presented to you in this case. And so I'm going to ask that you attempt to reach verdicts in the other charges in the case at this time. And so I will excuse you to return to your deliberations now.

After deliberating for several more hours, the jury returned guilty verdicts against Downing for armed robbery, armed kidnapping, armed carjacking, PFCOV, and CPWL. The next day, the jury could not reach a unanimous verdict on the murder counts and the court declared a mistrial as to those charges.

Cade pleaded guilty to second-degree murder while armed after the first trial, and so Downing proceeded to trial alone for the retrial on the murder charges. Butler again testified as a key government witness, reiterating much of his testimony he gave at the first trial but for certain notable differences. As opposed to his testimony at the first trial, Butler testified that he sold his nine millimeter gun to Downing and Cade in April or May of 2000, and clarified that he called Downing on May 5 to ask him and Cade to rob the "mini-mansion" because Butler knew that they had the weapon. When asked, Butler told Cade to give Butler the gun. Butler also testified that Downing, not Moody, first suggested killing Semino.

McManus again testified for the government and told substantially the same story that he told at the first trial. Specifically, he testified that around May 19, 2000, Downing came to his house to tell him that a lady had been shot and killed in the woods near Good Hope Road, Southeast, and that Downing was there with Cade, Butler, and Moody. He also told McManus that Moody shot Semino and that he used Semino's ATM card and that Moody used a nine millimeter gun to shoot Semino. McManus remembered Butler previously tried to sell to him a nine millimeter gun, and that he later saw such a gun when he visited Downing's house.

At the close of the second trial, the court instructed the jury on armed premeditated murder, armed felony murder, armed robbery, kidnapping, armed second-degree murder, and aiding and abetting in general and as applied to felony murder.

As to armed premeditated murder, the court instructed:

First degree premeditated murder is the killing of another person with the intent to kill that person with premeditation and deliberation and without mitigation. The essential elements of this offense, each of which the government must prove beyond a reasonable doubt, are: 1) that the defendant caused the death of the decedent; 2) that he did so with the intent to kill the decedent; 3) that he did so after premeditation; 4) that he did so after deliberation; 5) that at the time of the offense the defendant was armed with a pistol.

As to first degree felony murder while armed, the court instructed:

The essential elements of the offense of first degree felony murder while armed, each of which the government must prove beyond a reasonable doubt, are: 1) That the defendant caused the death of the decedent; 2) that for count 2 he did so while committing or attempting to commit robbery while armed, and for count 3 he did so while attempting to commit kidnapping while armed; and 3) that at the time of the offense, the defendant was armed with a pistol. The government need not prove that the defendant specifically intended to kill the

decedent. Any person who aids and abets the commission of robbery or kidnapping is guilty of felony murder for a killing that was committed in furtherance of a common purpose to commit that felony or a killing that was in the ordinary course of things a natural and probable consequence of acts done in committing that felony.

As to aiding and abetting in general and as applied to felony murder, the court instructed:

Any person who in some way intentionally participates in the commission of a crime aids and abets the principal offender. He therefore is as guilty of the crime as he would be if he had personally committed each of the acts that make up the crime. To find that the defendant aided and abetted in committing a crime, you must find that the defendant knowingly associated himself with the person who committed the crime, that he participated in the crime as something he wished to bring about, and that he intended by his actions to make it succeed.... An aider and abettor is legally responsible for the acts of other persons that are the natural and probable consequences of the crime in which he intentionally participates.

CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.02.II.C (4th ed.1996). Mindful of the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000),[13] the court and parties then submitted a verdict sheet to the jury that asked it for a decision on each of the murder charges, followed by this question:

If you found the defendant guilty of any of the First Degree Murder charges (Counts 1, 2, or 3), please answer Question 4.

4. Has the government proven beyond a reasonable doubt that the defendant committed:

Kidnapping: Yes [or] No

Robbery: Yes [or] No

After deliberating for a short while, the jury sent a note to the court, stating:

Please provide further guidance on Question 4.

1. How should this relate to Questions 1–3?

2. Does "committed" in this question include aiding and abetting? We need to know whether if we find the defendant guilty of one of the three counts, but we say "no" to Question 4, does that invalidate the verdict?

After consulting with the parties, the court instructed the jury that: 1) answering "no" to Question 4 would not invalidate a guilty verdict on the murder counts, and 2) that "committed" does include aiding and abetting. As to the jury's first question, the court instructed the jury that it should not be concerned with how question 1–3 relates to question 4, adding that it "may seem confusing to you, how to relate them. My answer is don't worry about it. Just answer the questions." After deliberating for a few more hours, and without sending any further notes to the court, the jury returned guilty verdicts on all the remaining murder charges.

---

**13.** In *Apprendi, supra,* the Supreme Court held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt." 530

U.S. at 490, 120 S.Ct. 2348. Thus, pursuant to *Apprendi*, in order to obtain an enhanced sentence of life without parole, the government was required to submit a verdict sheet.

857

## II.

*First Trial*

### A. Sufficiency of the Evidence for Armed Carjacking

■■■ Downing contends that the evidence was insufficient to convict him of armed carjacking. When reviewing an insufficient evidence claim, "[w]e view the evidence in the light most favorable to the government, recognizing the province of the trier of fact to weigh the evidence, determine the credibility of the witnesses and to draw reasonable inferences from the testimony." *Dickerson v. United States,* 650 A.2d 680, 683 (D.C.1994); *see Gibson v. United States,* 792 A.2d 1059, 1065 (D.C.2002). The government "must present 'at least some probative evidence on each of the essential elements of the crime.'" *Price v. United States,* 746 A.2d 896, 899 (D.C.2000) (quoting *Robinson v. United States,* 506 A.2d 572, 573 (D.C. 1986)); *Mihas v. United States,* 618 A.2d 197, 200 (D.C.1992) (internal quotation marks and citation omitted).

Because it was Butler and Cade who initially "bum rushed" Semino and took her car, Downing alleges that he cannot be convicted of the crime. Downing also alleges that Butler and Cade's trial testimony was unreliable. We disagree.

■■■ "The offense of armed carjacking is committed if a person knowingly or recklessly uses force or violence to take from another person immediate actual possession of a person's motor vehicle." D.C.Code § 22–2803(a)(1); *Winstead v. United States,* 809 A.2d 607, 609–10 (D.C. 2002) (internal citations and quotations omitted); *Pixley v. United States,* 692 A.2d 438, 439–40 (D.C.1997). "Immediate actual possession," borrowed from the robbery statute on which the carjacking statute is modeled, "refers to the area within which the victim can reasonably be expect-

ed to exercise some physical control over the property." *Winstead,* 809 A.2d at 610 (citations omitted). Something within "immediate actual possession" is "within such range that [one] could, if not deterred by violence or fear, retain actual physical control." *Id.* (citing *Rouse v. United States,* 402 A.2d 1218, 1220 (D.C.1979)). "A carjacker may take immediate actual possession ... at any point during a continuous course of assaultive conduct, not just at the starting point." *Beaner v. United States,* 845 A.2d 525, 533 (D.C.2004) (quoting *Winstead,* 809 A.2d at 611).

In this case, there was more than sufficient evidence from which a jury could infer beyond a reasonable doubt that Downing was guilty of armed carjacking. All four men agreed that they would rob a pedestrian and walked over to a bus stop to look for someone to rob. Butler identified Semino from the bus stop perch that all four men occupied and, when asked, Downing told Cade to give Butler the gun. Butler testified that he drew the gun and he and Cade "bum rushed" Semino, who had her keys in her hand and was walking towards her car. Cade then snatched the keys and started the car while Butler moved Semino into the backseat at gunpoint. Cade also drove the car around the block and picked up Downing and Moody. Downing entered the front passenger seat and Moody entered the backseat, such that Semino sat between Moody and Butler. Shortly thereafter, Downing and the others put Semino into the trunk of her car. Based on this evidence, viewed in a light most favorable to sustaining the jury's verdict, a jury could reasonably conclude that Downing was guilty of armed carjacking when he agreed to rob a pedestrian with the others, watched out for a victim on the bus stop, told Cade to give Butler the gun to commit the robbery, and then helped to put Semino into her trunk as the four men

drove her car away. *See Winstead, supra,* 809 A.2d at 610. As such, we affirm Downing's conviction for armed carjacking.

### B. Admission of Cade's Videotaped Statement

■ At the first trial, the government introduced in its case-in-chief a redacted version of a videotaped statement Cade had initially made to an officer investigating Semino's murder. In the tape, Cade acknowledged that he was present when the robbery and murder of Semino occurred. Cade referred to the other men involved as "Leon," "Leon's cousin," [14] and "my friend." [15]

Because of a potential for prejudice to Downing from Cade's videotaped statement, the trial court sanitized the videotaped evidence by ordering the government to delete any statements that would lead the jury to infer that Downing was one of the individuals with Cade on the night of the offense since as a co-defendant, Downing would not have an opportunity to cross-examine Cade about the testimony. The court further instructed the jury that the videotaped statement could only be used to determine Cade's guilt or innocence because the videotape was admissible only against Cade. After the government rested, however, Cade chose to testify. During his live testimony, Cade placed both himself and Downing at the scene of the robbery and subsequent murder. During Cade's cross-examination, he also testified that the person to whom he referred in the videotape as "my friend" was Downing. Despite the fact that Cade presented live testimony and was cross-examined by Downing, the court once again instructed the jury in closing that Cade's videotaped statement was admissi-

ble only against Cade, and not against Downing.

On appeal, Downing alleges that the trial court erred in admitting the redacted videotape statement because it denied him rights secured by the Confrontation Clause of the Sixth Amendment under the *Bruton* line of cases. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). We disagree. Because Cade ultimately testified and was subject to cross-examination by Downing's counsel about his live and videotaped testimony, Downing's Confrontation Clause rights were not violated by the admission of Cade's videotaped statement.

■ As an initial matter, we note that Downing failed to raise this claim of a Confrontation Clause violation at trial. Therefore, our review of this claim is for plain error. "Plain error review permits us to grant a remedy where (1) there is error, (2) the error is plain, meaning 'clear' or 'obvious,' and (3) the error affected substantial rights." *Baker v. United States,* 867 A.2d 988, 1002 (D.C.2005); *see United States v. Olano,* 507 U.S. 725, 732–35, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). Moreover, the error must "seriously affect[ ] the fairness, integrity, or public reputation of the judicial proceedings." *Olano,* 507 U.S. at 736, 113 S.Ct. 1770. We reverse only where the error resulted in "manifest injustice" or a "clear miscarriage of justice." *York v. United States,* 803 A.2d 1009, 1011 (D.C.2002); *Perkins v. United States,* 760 A.2d 604, 609 (D.C. 2000).

In *Bruton, supra,* the Supreme Court recognized that an out-of-court statement implicating a non-confessing co-defendant is inherently prejudicial. 391 U.S. at 135–

---

**14.** The record reflects that Cade was referring to Moody, who he mistakenly believed was Butler's cousin.

**15.** "My friend" referred to Downing.

137, 88 S.Ct. 1620; *see Johnson v. United States,* 883 A.2d 135, 141 (D.C.2005). The Court held that a defendant's Confrontation Clause rights were violated where incriminating references were not deleted and the declarant co-defendant did not take the stand such that the defendant had no opportunity to cross-examine the co-defendant. *Bruton,* 391 U.S. at 137, 88 S.Ct. 1620. Moreover, the court concluded that a limiting instruction could not alleviate the harm because of the prejudicial impact such a statement could have on a jury. *Id.* at 132, 88 S.Ct. 1620. In *Richardson v. Marsh,* the Supreme Court held that a statement is properly admitted with limiting instructions where a defendant's name and any reference to his or her existence are eliminated from the co-defendant's extrajudicial statement. 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *see Foster v. United States,* 548 A.2d 1370, 1378 (D.C.1988) (finding a redacted statement that substituted a neutral reference to a defendant admissible insofar as there existed no substantial risk that the jury will consider the statement).

Downing's reliance on the *Bruton* line of cases to attack the admission of his redacted statement is misplaced, however, because unlike the co-defendants in these cases cited above, Cade testified at their joint trial. Therefore, the Confrontation Clause concern that the *Bruton* line of cases seeks to address is not present here. Cade was subjected to a full cross-examination by Downing and therefore, cannot complain that he was prejudiced by the trial court's decision. *See Lemon v. United States,* 564 A.2d 1368, 1372 (D.C.1989) ("The Constitution as construed in *Bruton* . . . is violated *only* where the out-of-court hearsay statement is that of a declarant who is unavailable at the trial for 'full and effective' cross examination.") (citing *Nelson v. O'Neil,* 402 U.S. 622, 627, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971)) (emphasis in original); *see also Nelson,* 402 U.S. at 626, 91 S.Ct. 1723 ("the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination.") (citing *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)); *see also Crawford v. Washington,* 541 U.S. 36, 38 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("when the declarant appears for cross-examination at trial, the *Confrontation Clause* places *no* constraints at all on the use of his prior testimonial statements.") (emphasis added). Because Cade testified in this case and there was no limitation on Downing's cross-examination of Cade, the admission of Cade's videotaped statement was not error, let alone plain error, because Downing was not at all prejudiced by its admission.

### C. Jury Note Revealing Juror Split at First Trial

 During the first trial, after the jury began its deliberations, the jury sent a note to the court that it had reached a partial verdict. The jury sent a second note, that was signed by all the jurors except Juror 773, stating that they believed the jury was hung because one juror refused to apply the law and disagreed with the charges brought against appellant. Thereafter, the court received a third note signed only by Juror 773 that stated: "Juror 773 wishes to express her right as a juror."

Appellant moved for a mistrial only for the counts as to which the jury had not reached a verdict and requested that the court not give a anti-deadlock instruction because it would be coercive given the eleven to one split. The court discussed the notes with the parties, including a potential jury instruction, and stated that it would not give an anti-deadlock instruc-

tion. Before the trial court responded to the jury notes, the jury returned with a partial verdict, finding Cade guilty of all of the non-murder felonies and Downing guilty of conspiracy to commit armed robbery. The jury also indicated that it had not reached unanimous verdicts on any of the other outstanding charges. At that time, the trial court reminded the jury to never reveal its numerical split, and told the jury that it did not want to coerce a verdict. The court then instructed the jury to continue its deliberations. At the end of the day, the jury returned guilty verdicts against Downing on the charges of armed robbery, armed kidnapping, armed carjacking, possession of a firearm during a crime of violence, and carrying a pistol without a license. The following day, the jury again deliberated but was unable to reach a verdict on any of the murder counts, and the trial court declared a mistrial as to those charges.

On appeal, Downing argues that the court's instruction to the jury to continue deliberations coerced a guilty verdict. According to Downing, the trial court should have declared a mistrial as soon as the numerical split was revealed to the court or, at the latest, when the jury first returned partial verdicts against Cade and Downing. Downing's argument is without merit.

 We review the trial judge's decision to return the jury to deliberation under an abuse of discretion standard. *See Barnes v. United States,* 822 A.2d 1090, 1092 (D.C.2003); *(Robert)Harris v. United States,* 622 A.2d 697, 701 (D.C. 1993), *cert. denied,* 510 U.S. 1129, 114 S.Ct. 1097, 127 L.Ed.2d 410 (1994). We evaluate jury coercion in light of all the circumstances of the case and from the perspective of the jurors. *See Smith v. United States,* 542 A.2d 823, 825 (D.C.1988); *Harris,* 622 A.2d at 701. While a trial judge

has a right to order a jury to deliberate further after learning that a jury is having difficulty reaching a unanimous verdict, *(Robert)Harris,* 622 A.2d at 705, our role is to determine whether that decision was inherently coercive, *Ford v. United States,* 759 A.2d 643, 647 (D.C.2000) (citing *Harris,* 622 A.2d at 701–02), and whether the actions of the trial judge in ordering the jury to resume deliberations exacerbated, alleviated, or were neutral with respect to coercing a potential verdict. *Id.* "[I]f a juror is forced to abandon an honest conviction, the resulting verdict cannot stand." *(Robert)Harris,* 622 A.2d at 701 (citations omitted).

 In making these assessments, we look to several factors including: (1) the degree of isolation of a dissenting juror, (2) whether the identity of a dissenting juror is revealed in open court as opposed to in a note, (3) whether the exact numerical division of the jury is revealed, (4) whether the judge knows the identity of a dissenting juror and whether or not jurors may feel "bound" by a vote they have announced, (5) whether an anti-deadlock instruction has been given, and, if it has, (6) whether the instruction occurred under circumstances manifesting a high potential for coercion. *See Ford, supra,* 759 A.2d at 647; *Harris, supra,* 622 A.2d at 705. A *Winters* anti-deadlock instruction given after a jury reveals its numerical split evinces "great potential for coercing a verdict." *Benlamine v. United States,* 692 A.2d 1359, 1363 (D.C.1997).

In this case, the combination of the jury notes gave the court reason to believe that there was a possible numerical split of eleven-to-one, since Juror 773 was the only dissenting juror. While the judge was aware that Juror 773 was the sole dissenter, the juror was not "isolated" by the court because the juror was not "interrogated, questioned, or otherwise singled

out" by the court. *See Green, supra,* 740 A.2d at 29. Further, there was no indication in the note written by Juror 773 that she felt in any way intimidated by the other jurors. In fact, the note expressed a resolve not to be coerced into joining any verdict that the juror felt was unjust. Moreover, nothing in either jury note revealed the specific count as to which Juror 773 dissented. *See (Robert)Harris, supra,* 622 A.2d at 706 (concluding that "there was more ambiguity and less isolation surrounding the dissent in that the twelfth juror's answer did not reveal the specific count or charge from which she dissented nor the specific basis for the dissent.").

Further, the jury note indicating that one of the jurors disagreed with the majority view did not necessarily mean that the trial court was faced with a deadlocked jury. *See Green, supra,* 740 A.2d at 29–30 (concluding that there was no jury deadlock where the jurors stated that they were unable to reach an agreement instead of indicating that they were deadlocked). Moreover, the fact that the jury returned verdicts on several counts before the trial court instructed them to continue their deliberations is a strong indication that the trial court was correct not to consider the jury deadlocked. Significantly, the court also declared that it would not give an anti-deadlock instruction after receiving the notes from the jurors, and instead merely instructed the jury to continue deliberating. *See id.* at 30 ("An exhortation to the jury to continue deliberating, without more, has never been held by this court to approach an anti-deadlock instruction."); *see also Ford, supra,* 759 A.2d at 648 (concluding that there was no risk of coercion where the judge never gave a *Winters* anti-deadlock instruction).

Where as here, the trial judge's instruction did not exacerbate any inherent coercive potential and contained significant ameliorative elements, we rarely, if ever find that a verdict has been coerced. *Ford, supra,* 759 A.2d at 647 (citing *(Robert)Harris, supra,* 622 A.2d at 701–02). "[C]oercion may be averted where a trial court acts with appropriate precaution." *(Robert)Harris,* 622 A.2d at 704. In this case, the court's statement to the jury that it did not intend to coerce a verdict and that the jury should continue its deliberations to "attempt to reach a verdict," significantly reduced the risk of potential juror coercion. *See id.* at 706 n. 17 (stating that when a jury poll reveals dissent, a court's instruction to resume deliberations "is appropriate in that nothing is said that could be interpreted as coercive ...").

Furthermore, while we have no way of knowing to which counts the initial eleven to one division applied, when a mistrial was finally declared and the jurors revealed their split on the murder charges, the division was ten-to-two. Assuming that Juror 773 remained unconvinced by the government's evidence on several of the counts, the fact that she was joined by another dissenter is another strong indication that the jurors were able to weigh the evidence in an atmosphere free of coercion. Thus, we are satisfied that the trial court did not abuse its discretion when it failed to declare a mistrial after the jury split was first revealed and instead instructed the jurors to continue their deliberations. *See Ford, supra,* 759 A.2d at 648 (concluding that "[t]elling the jurors to do what they have already sworn to do is not coercion.").

### Second Trial

#### A. First-degree Premeditated Murder and Felony Murder

Downing argues on appeal that his conviction for first-degree murder cannot stand because the government failed to introduce sufficient evidence of his premeditation, deliberation or intent to justify

such a verdict with respect to the killing of Semino. Downing also points out that there was little evidence of motive and there were no impartial eyewitnesses to the murder. Additionally, Downing challenges the sufficiency of the evidence to support his felony murder convictions on the ground that there was no evidence presented that the murder of Semino was in furtherance of the underlying felonies. In this vein, Downing argues that Moody, the principal in Semino's murder, engaged in a 'separate and distinct act' when he shot Semino. We disagree, and find the evidence sufficient to support Downing's convictions.[16]

"First-degree premeditated murder is murder committed with the specific intent to kill after premeditation and deliberation." *Kitt v. United States,* 904 A.2d 348, 353 (D.C.2006); *see also* D.C.Code § 22–2401 ("Whoever ... kills another purposely ... either of deliberate and premeditated malice ... is guilty of murder in the first degree."). The government must show that before acting the accused "gave thought to the idea of taking a human life and reached a definite decision to kill." *Ruffin v. United States,* 642 A.2d 1288, 1291 (D.C.1994) (quoting *Mills v. United States,* 599 A.2d 775, 781 (D.C.1991)) (internal citation omitted). Deliberation requires a showing that "the accused acted with consideration and reflection upon the preconceived design to kill." *Id.* "Premeditation means that the defendant formed the specific intent to kill the victim for some length of time, however, short, before the murderous act." *Kitt,* 904 A.2d at 353 (quoting *Williams v. United States,* 858 A.2d 984, 1001 (D.C. 2004)). Both premeditation and deliberation may

be inferred from the surrounding facts and circumstances, and may occur in only a few seconds. *See (Mark)Harris v. United States,* 668 A.2d 839, 842 (D.C.1995); *Porter v. United States,* 826 A.2d 398, 405 (D.C.2003) (discussing that a time lapse can demonstrate an opportunity for deliberation).

Downing was convicted of first-degree murder under an aiding and abetting theory. "A conviction for aiding and abetting requires proof of three elements: 1) a crime was committed by someone; 2) appellant assisted or participated in its commission; and 3) he did so with guilty knowledge." *McCullough v. United States,* 827 A.2d 48, 57 (D.C.2003) (citing *Blakeney v. United States,* 653 A.2d 365, 370 (D.C.1995)). An aider and abettor can be charged as the principal for all acts committed in furtherance of the common purpose. *Id.* "While mere presence at the scene of a crime is insufficient to establish criminal participation in the offense, proof of presence at the scene of a crime plus conduct which designedly encourages or facilitates a crime will support an inference of guilty participation in the crime as an aider and abettor." *Porter, supra,* 826 A.2d at 406 (citing *Jefferson,* 463 A.2d 681, 683 (D.C.1983)).

Viewed in the light most favorable to the government, the evidence presented at the second trial was sufficient to support the jury's verdict that Downing committed first-degree premeditated murder under an aiding and abetting theory. The evidence demonstrated that Downing told Cade to give Butler the gun, a request with which Cade complied. Butler testified that Downing proposed killing Semino

---

**16.** Our review of Downing's convictions for first-degree and felony murder are limited to the facts presented in the second trial inasmuch as the jury in the first trial did not render a verdict on the murder charges. *Wright v. United States,* 513 A.2d 804, 808 (D.C.1986).

before anyone else, and that the discussion about killing Semino lasted for a "long period" of time while the four men were driving her vehicle. The evidence also indicated that it was Downing who suggested the wooded Southeast location where the murder took place and gave directions to that location. Finally, there was evidence presented at trial that Downing stood within a few feet of Moody when he shot and killed Semino. Based on this evidence, a reasonable mind could conclude beyond a reasonable doubt that Downing was not merely present at the scene of the crime; but rather, that Downing participated concretely in the planning and execution of the murder. *See McCullough, supra,* 827 A.2d at 57; *Porter, supra,* 826 A.2d at 406 (citing *Jefferson v. United States,* 463 A.2d 681, 683 (D.C.1983)).

After Downing's trial, but while this case was pending on appeal, however, we held in *Wilson–Bey v. United States,* 903 A.2d 818 (D.C.2006), that our standard aiding and abetting instruction and specifically the "natural and probable consequences" language, should not be given in first-degree premeditated murder cases because it allows the jury to find guilt without having to find that appellant possessed the requisite *mens rea* required for conviction of a defendant for first-degree murder.[17]

However, Downing is not entitled to a new trial merely because the law has changed. Under the circumstances of this case, where no objection was raised to the aiding and abetting instruction that was given, Downing must show that there was plain error before a new trial is warranted. In other words, Downing must convince this court that the error was plain, and that the error affected substantial rights in order to prevail. *See* Super. Ct.Crim. R. 52(b); *Thomas v. United States,* 914 A.2d 1, 5–6 (D.C.2006). Moreover, the error must have "seriously affect[ed] the fairness, integrity, or public reputation of the judicial proceedings." *See Olano, supra,* 507 U.S. at 736, 113 S.Ct. 1770. While the error is (now) plain, we see no reasonable likelihood that it prejudiced Downing, and we are satisfied that it did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings. Thus, we are satisfied that Downing is not entitled to a new trial.

In this case, although Downing argues that there was insufficient evidence of his motive to find him guilty of first-degree premeditated murder, the record clearly indicates otherwise. In fact, no reasonable juror could have concluded that he had any intent other than to kill Semino nor could a reasonable juror have concluded that the actions taken by Downing prior to the killing were anything other than deliberate and premeditated. According to the evidence presented at trial, Downing was the first of the assailants to suggest killing Semino. He then provided directions to the location where the murder took place, and helped remove Semino from the car.

---

**17.** As to aiding and abetting in general and as applied to felony murder, the court instructed:

> Any person who in some way intentionally participates in the commission of a crime aids and abets the principal offender. He therefore is as guilty of the crime as he would be if he had personally committed each of the acts that make up the crime. To find that the defendant aided and abetted in committing a crime, you must find

that the defendant knowingly associated himself with the person who committed the crime, that he participated in the crime as something he wished to bring about, and that he intended by his actions to make it succeed.... An aider and abettor is legally responsible for the acts of other persons that are the natural and probable consequences of the crime in which he intentionally participates.

Finally, it was Downing who was standing next to Moody when he shot and killed Semino. Based on this evidence, we are satisfied that Downing was convicted of first-degree premeditated murder because he had the requisite intent to commit the crime, and therefore the giving of an instruction on aiding and abetting in this case did not materially impact the jury's verdict. *See* 903 A.2d at 846–47. Accordingly, we see no basis to conclude that Downing was prejudiced or that the fairness, integrity, or public reputation of his trial was undermined by the jury instruction.

Downing's situation on appeal is much different than the situation we were faced with in *Wilson–Bey*. First, counsel in *Wilson–Bey* objected to the giving of the aiding and abetting instruction and therefore, our review was for harmless error as opposed to plain error. Further, in *Wilson–Bey* we concluded that there was a reasonable possibility that absent the aiding and abetting instruction, Wilson–Bey's co-defendant, Marbury, might not have been convicted of first-degree murder because the evidence of her intent to commit murder as opposed to assaulting her victim was less than overwhelming. As a result, we held that "[u]nder the trial court's 'natural and probable consequences' instruction, a juror who believed that Ms. Marbury's intent was merely to join in an *assault* . . . could nevertheless reasonably find Ms. Marbury guilty of aiding and abetting armed *premeditated* murder. The error was therefore decisive. . . ." *Id.* at 845 By contrast, in this case, the evidence of Downing's intent to murder Semino was overwhelming, and thus, the giving of the aiding and abetting instruction did not prejudice him or "seriously affect[ ] the fairness, integrity, or public reputation of the judicial proceedings." Therefore, there was no plain error in this case. *See Olano, supra,* 507 U.S. at 736, 113 S.Ct. 1770; *Howard v. United States,* 656 A.2d 1106, 1112–13 (D.C.1995) (holding that the evidence surrounding appellant's specific intent was overwhelming, such that it negated any possible prejudice from the instruction).

▪▪▪ Finally, because the evidence was sufficient to support Downing's conviction for first-degree murder, this court need not address whether the evidence adduced at trial was sufficient to support Downing's first-degree felony murder convictions because Downing cannot remain convicted of multiple counts of murder for one victim. *See Thacker v. United States,* 599 A.2d 52, 63 (D.C.1991). Because Downing "cannot remain convicted of both first-degree premeditated murder and first-degree felony murder of the same victim," *Thacker,* 599 A.2d at 63 (citations omitted), we remand the case to the trial court with instructions to vacate the two felony murder convictions.[18] *See id.* at 63–64.

The judgment of the Superior Court is therefore *affirmed* on its merits and *remanded* for resentencing consistent with this opinion.

*So ordered.*

▪▪▪

---

18. Because we remand with instructions to vacate Downing's felony murder convictions, we need not address his alternative argument that those convictions must be reversed because the jury misunderstood the law based on the court's failure to instruct the jury that "felony murder must be committed in relation to the predicate felony, not as a separate and distinct act undertaken by an accomplice."