[Cite as *State v. Brown*, 2023-Ohio-4452.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                          Court of Appeals No.    WD-23-001
                                                                               WD-23-008
        Appellee
                                                       Trial Court No.  2021-CR-0575
                                                                        2022-CR-0220
v.

Marquise L. Brown                                      **DECISION AND JUDGMENT**

        Appellant                            Decided:  December 8, 2023

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Chief Assistant Prosecuting Attorney, for appellee.

Jeffrey P. Nunnari, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} In this consolidated appeal, following a jury trial, defendant-appellant, Marquise L. Brown, appeals the February 9, 2023 judgments of the Wood County Court of Common Pleas, convicting him of misdemeanor assault and felonious assault with a firearm specification.  For the following reasons, we affirm the trial court judgment.

## I. Background

{¶ 2} On December 2, 2021, Marquise Brown was indicted in Wood County case No. 2021-CR-0575, on charges of obstructing justice, a violation of R.C. 2921.32(A)(5) and (C)(3), and misdemeanor assault, a violation of R.C. 2903.13(A) and (C). On June 2, 2022, he was indicted in Wood County case No. 2022-CR-0220, on charges of felonious assault, a violation of R.C. 2903.11(A)(2) and (D)(1)(A), with an accompanying firearm specification under R.C. 2945.145(A), and obstructing official justice, a violation of R.C. 2921.32(A)(5) and (C)(4). The obstruction charges were dismissed in both cases, and the matter proceeded to a jury trial on the assault and felonious assault charges only, along with the firearm specification.

{¶ 3} According to the state, on October 2, 2021, around 11:40 p.m., Bowling Green police responded to a call of shots fired near Liquid Bar and Tiki Bar in downtown Bowling Green. Police arrived to find that a man, D.M., had been shot twice in the leg in a parking lot alongside Howard's, another nearby bar. The incident happened during the school year, when numerous young adults were out frequenting the downtown bars. Police officers spoke to witnesses and gathered footage from security cameras mounted along the downtown streets, as well as footage from a private security camera located outside Liquid Bar.

{¶ 4} Witnesses told police that after the shots were fired, they saw several males run to a white vehicle in a nearby parking lot and flee. One witness described that one of the males slipped and dropped something, then picked it up. A description of the vehicle

2.

and its license plate number were provided to police, as was a photograph of the vehicle, which had been taken by a witness.

{¶ 5} The vehicle description and license plate number enabled police to locate the vehicle, which they spotted on East Wooster Street heading toward I-75. Officers initiated a stop of the vehicle, an Infinity, ordered the five passengers out of the vehicle, and transported them to the Bowling Green Police Department. Brown was one of the passengers. No firearm was found in the vehicle, but police located a satchel.

{¶ 6} All five passengers were questioned, including Brown. Brown denied being at the parking lot or running from the parking lot. He also denied that he had been involved in any confrontation. The five passengers of the Infinity were swabbed for gunshot residue. Brown tested positive for four particles of gunshot residue on his left hand and one particle on his right hand. Two of the passengers tested negative. The other two tested positive for one particle each. None of the men were arrested that night.

{¶ 7} Detectives collected and thoroughly reviewed the security camera footage. They were able to identify the Infinity and its occupants and piece together their movements for the approximately 20 minutes preceding the shooting and immediately thereafter. The men got in line at Liquid Bar. While standing in line, a man who appears to be Brown was wearing a satchel like the one found in the Infinity. He and the other occupants of the Infinity appeared to be talking to another group of men who were also in line. While those men's backs were to Brown, Brown pulled something out of the satchel—it appeared to be a gun—and put it in the pocket of his sweatpants. Soon after,

3.

Brown punched one of the men (forming the basis for the misdemeanor assault charge here). He motioned for the men to follow him, and they all left the frame of the video. Within seconds, four gunshots rang out and the young people in the streets began running.[1] The five men from the Infinity ran across the street. Consistent with what was reported by one of the witnesses, Brown dropped something while he was running and picked it up. Moments later, the Infinity came into view and traveled north.

{¶ 8} Four shell casings were collected at the scene. It was determined that the casings had all been fired from the same gun. The gun was recovered in March of 2022. A bullet lodged in D.M.'s leg was eventually extracted and identified as having been fired by that gun. The gun belonged to Brown's brother, K.B., who reported it stolen on February 17, 2022. An officer had seen K.B. and Brown's mother in the vicinity of the traffic stop and at the police station the night of the shooting.

{¶ 9} Brown presented two witnesses, one who testified that the shooter may have been wearing a gray hoodie, and one who believed the shots had been fired by a person in a red vehicle. It had been suggested during trial that the group of men that Brown and the other Infinity occupants were talking to, had arrived in downtown Bowling Green in a red vehicle, and a red car was seen leaving the scene as officers were arriving. The victim also acknowledged seeing a red car in the parking lot before he was shot, but he also testified that he saw Brown and his friends (who he recognized from high school sports)

---

[1] There was testimony that the audio lagged about 30 seconds behind the video on the recording.

4.

and they seemed to be arguing with the people in the red car. D.M. did not see who shot him, but the shots did not come from the direction of the red car. D.M.'s nephew, who was with him that night, said that the shots were directed at the red car, but this testimony potentially conflicted with information he provided the night of the shooting.

{¶ 10} The jury convicted Brown of misdemeanor assault, felonious assault, and the firearm specification. The trial court sentenced Brown to 180 days in jail in Wood County case No. 2021-CR-0575. It sentenced him to a minimum prison term of six years and a maximum prison term of nine years in Wood County case No. 2022-CR-0220, plus three years on the firearms specification to be served consecutively. It ordered the sentences in case Nos. 2021-CR-0575 and 2022-CR-0220 be served concurrently.

{¶ 11} Brown appealed. He assigns the following error for our review:

> THE TRIAL COURT'S UNJUSTIFIED MID-TRIAL DESIGNATION OF JUROR #6 AS AN ALTERNATE JUROR OVER APPELLANT'S OBJECTION AMOUNTS TO STRUCTURAL ERROR MANDATING REVERSAL AND A NEW TRIAL.

## II. Law and Analysis

{¶ 12} Brown argues that the trial court demonstrated judicial bias constituting structural error requiring reversal when, after the state presented its last witness, it designated Juror #6 an alternate juror instead of using its usual procedure of selecting alternate jurors randomly. Before we address the merits of Brown's arguments, we will

5.

describe the trial court's usual procedure for selecting alternates and summarize the events that led to the trial court's decision to designate Juror #6 an alternate.

## A. The Process for Selecting Alternates and the Decision
## to Designate Juror #6 an Alternate Juror

{¶ 13} The trial court's usual procedure for picking a jury is to select 14 jurors from the venire. After both sides have rested, the court puts the juror's numbers into a basket and allows the defendant to draw two numbers from the basket. The two jurors whose numbers are drawn are designated as alternate jurors. Here, instead of randomly drawing numbers for both alternate positions, the trial court designated Juror #6 an alternate and allowed Brown to draw only one juror's number to serve as the second alternate. The reasons for that are as follows.

{¶ 14} As permitted under Crim.R. 24(J), the trial court allowed jurors to submit written questions for witnesses. In accordance with that rule, before reading a question to a witness, the court provided counsel the opportunity to object to the questions on the record and outside the hearing of the jury. Where it was agreed that a question would be asked, the court read the question to the witness and permitted counsel to reexamine the witness regarding matters addressed by the jurors' questions. The court instructed the jurors that if they submitted a question and it was not asked, they should not draw any conclusions concerning the decision not to ask the question. It told the jurors that if they did not have a question, they should write "no question" on their paper and pass the paper

6.

down to be collected with the others. The court explained that this procedure would "ensure anonymity for the particular jurors who submit questions."

{¶ 15} One of the jurors was especially engaged and proposed numerous questions over the course of the trial (as determined by the fact that many questions were written in the same handwriting). The state characterized this juror's questions as "accusatory, conspiratorial, and in some cases not even questions that the Court would be able to articulate." Despite its assurance of anonymity, the trial judge undertook to determine which juror had proposed the questions the state found objectionable. The trial judge suspected that it was Juror #6. After one of the state's witnesses finished testifying, the trial judge watched him and observed that he was passing down several sheets of paper. Upon reviewing the questions, he saw that multiple questions were written in the same handwriting. Based on these observations, the trial judge concluded that Juror #6 had proposed the questions about which the state was complaining.

{¶ 16} The trial judge went into the jury room "in an attempt to just be congenial" and asked the jurors "how they were doing," "how they [we]re physically doing," whether they were having "any problems parking," and "things like that." He then asked them if they had "any questions relative to that, those kinds of issues." Juror #6 asked the trial judge why he hadn't asked his questions. The trial judge told him he could not answer that question. The next morning, on the record, the trial judge reminded the jurors that they may not speculate as to why their questions were not being asked and provided several examples of why a question may not be asked (e.g., the rules of

7.

evidence, relevance, not the right witness to ask, etc.). Off the record, he also told one of the state's attorneys who he believed had submitted the questions—it is unclear from the record whether defense counsel was present when the juror's identity was first disclosed to the state.

{¶ 17} After its last witness testified, the state moved to dismiss Juror #6 on the basis that he had exhibited "potential animus or bias toward law enforcement" in his questions and had shown "bravado in his bias" by asking the trial judge why his questions weren't being asked. It provided examples of the questions it found objectionable:

> BG police Lab has no video editing capabilities?
>
> If you could not charge the individuals with anything that night/morning, how could you impound their vehicle?
>
> Is it video or report that supercedes one or the other[?] [W]hich is more official?[2]

The trial judge recounted for the attorneys his investigation into the juror's identity. The state cited numerous cases that it claimed granted the court discretion to remove Juror #6.

---

[2] The state believed that Juror #6 also asked if there was a way to alter striations on a bullet casing, but this question does not appear to have come from Juror #6—the handwriting and color of ink is completely different than the other proposed questions attributed to Juror #6.

8.

{¶ 18} Defense counsel objected. He argued that the cases relied upon by the state were distinguishable. He disagreed that the juror had exhibited bias and pointed out the oddity of allowing jurors to ask questions, but then taking the position "we don't like the questions" so "let's remove the juror." His position was that the juror had merely exhibited curiosity and was trying to get clear information in order to make the credibility determinations that he was required to make. Although defense counsel agreed that some of the questions may have been "odd," he disagreed that the questions exhibited bias.

{¶ 19} At some point, the state altered its position and requested that Juror #6 be designated an alternate rather than dismissed. The trial court granted the motion. It explained: "I don't know that there's been any kind of proof that [Juror #6] is either biased or not biased. But the State feels that he is biased. And I think the best resolution to ease or ameliorate their feelings of bias is to designate [Juror #6] an alternate. * * * Juror #6 will be designated as alternate number one. Alternate number two will be chosen by lot."[3]

{¶ 20} Brown claims that by designating Juror #6 an alternate juror, the trial court exhibited bias in favor of the state by "act[ing] in a manner to assist the state in ferreting

---

[3] In discussing logistical issues about how to preserve this issue for appellate review, the trial court said that it would seal the questions but make them available for review by appellate counsel. The court said that by doing so it was violating its promise to the jurors that their notes and questions would be "A, anonymous, and B, would be destroyed." Crim.R. 24(J)(2), however, requires the trial court to "[r]etain a copy of each proposed question for the record." In other words, the court should not promise jurors that it will destroy their proposed questions.

out a juror with which it had concerns" and by "acquiesce[ing] in [the state's] request to effectively remove the juror in question from the jury panel without justification." He insists that this error constitutes structural error requiring reversal.

## B. Structural Error

{¶ 21} A structural error is an error that affects the framework within which a trial proceeds rather than a mere error in the trial process itself. *State v. West,* 168 Ohio St.3d 605, 2022-Ohio-1556, 200 N.E.3d 1048, ¶ 25. It is "a violation of the basic constitutional guarantees that define the framework of a criminal trial; it is not susceptible to harmless-error review but rather, when an objection has been raised in the trial court, is grounds for automatic reversal." *Id.* at ¶ 2, citing *State v. Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872, ¶ 2, 20.

{¶ 22} Structural error is recognized only in limited circumstances where fundamental constitutional rights are involved. *Id.* at ¶ 26. Examples include "denial of counsel to an indigent defendant, the denial of counsel of choice, the denial of self-representation at trial, the denial of a public trial, and the failure to instruct the jury that the accused's guilt must be proved beyond a reasonable doubt." *Id.*, citing *Weaver v. Massachusetts*, 582 U.S. 286, 295, 137 S.Ct. 1899, 198 L.Ed.2d 420 (2017); *United States v. Davila*, 569 U.S. 597, 611, 133 S.Ct. 2139, 186 L.Ed.2d 139 (2013). The Ohio Supreme Court has recognized that "[t]he presence of a biased judge on the bench is, of course, a paradigmatic example of structural constitutional error." *State v. Sanders,* 92 Ohio St.3d 245, 278, 750 N.E.2d 90 (2001). But it has also recognized that "[r]eplacing a

10.

juror with an alternate juror * * * does *not* invoke a structural-error analysis." (Emphasis added.) *State v. Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, 172 N.E.3d 8, ¶ 196, citing *State v. Jennings*, 2017-Ohio-8224, 100 N.E.3d 93, ¶ 9-13 (8th Dist.).

{¶ 23} Here, Brown claims that the trial court demonstrated favoritism toward the state during the trial—which, if true, would be judicial bias, and therefore structural error—when it designated Juror #6 an alternate at the state's request.

## C. Authority to Remove a Juror

{¶ 24} Under R.C. 2945.29, "[i]f, before the conclusion of the trial, a juror becomes sick, or for other reason is unable to perform his duty, the court may order him to be discharged. In that case, if alternate jurors have been selected, one of them shall be designated to take the place of the juror so discharged * * *." Additionally, a trial court in its discretion may dismiss a juror "'when it determines that a juror possesses either enmity or bias toward a party or determines that for some other reason a juror is not impartial or is otherwise unsuitable for service.'" *State v. Smith*, 6th Dist. Lucas No. L-19-1075, 2020-Ohio-5445, ¶ 28, quoting *State v. Midwest Pride IV, Inc.*, 131 Ohio App.3d 1, 20, 721 N.E.2d 458 (12th Dist.1998).

{¶ 25} Courts have found no abuse of discretion in a trial court's decision to remove a juror in cases where the juror was observed laughing inappropriately, "exhibiting odd behavior, and was not forthcoming in providing her address"; where the juror "threatened or intimidated other jurors and disrupted deliberations"; where the juror "cursed at other jurors and actively humiliated them through the use of vindictive

11.

personal attacks such as calling them 'stupid' and 'monkeys'"; where the juror "was unstable, disruptive to the deliberations, and a safety threat to the female jurors"; and where the juror was seen talking to the defendant's mother. *State v. Zaragoza*, 2d Dist. Montgomery No. 26706, 2-16-Ohio-144, ¶ 21, 23, citing *State v. Segines*, 8th Dist. Cuyahoga No. 89915, 2008-Ohio-2041; *Shotikare v. U.S.*, 779 A.2d 335, 340 (D.C. 2001); *State v. Arnold*, 629 S.E.2d 807 (Ga.2006); *State v. Pruitt,* 11th Dist. Trumbull No. 2001-T-0101, 2003-Ohio-1882, ¶ 19.

{¶ 26} The state maintains that "the removal of a biased juror does not trigger structural error analysis." We begin by observing that the trial court did not find that Juror #6 was biased; it found only that *the state* believed that Juror #6 was biased. Brown acknowledges that a trial judge has discretion to remove a juror "whenever facts are presented which convince the trial judge that the juror's ability to perform his duty as a juror is impaired" and that "a party complaining about juror misconduct must establish prejudice"—i.e., that one of the jurors at his trial, because of partiality or bias, was incapable or unwilling to decide the case solely upon the evidence. *See e.g., Smith* at ¶ 33 (concluding that the defendant could not demonstrate prejudice because "the trial court's dismissal of certain prospective jurors did not preclude him from receiving a fair trial by an impartial jury, as is his right," because it replaced those jurors with "equally capable jurors").

{¶ 27} To that end, while Brown maintains that the trial court abused its discretion when it designated Juror #6 an alternate despite being unconvinced that he was actually

12.

biased, this is not the error he has assigned. He assigns error—structural error—because he maintains that the trial court demonstrated favoritism toward the state when it designated Juror #6 an alternate—i.e., that the trial judge demonstrated bias in favor of the state.

{¶ 28} While we are clarifying the issue presented for review and making clear that the trial judge did not find that Juror #6 was biased—he said that he did not know that there had been any kind of proof that Juror #6 was "either biased or not biased"—we take this opportunity to also correct a mischaracterization the state repeatedly makes in its brief. Specifically, according to the record, the trial judge told the parties that when he spoke with the jurors and asked them if they had any questions, Juror #6 asked, "[C]an I ask you about why my question wasn't asked." The trial judge told Juror #6 that he could not and would not answer that question, and the trial judge told the attorneys that "[t]hat was the discussion." Nevertheless, the state represents in its brief—numerous times— that the trial judge was "confronted by an angry juror"; that Juror #6 "angrily confronted" the trial judge; that Juror #6's responses during voir dire hinted that he may become "combative";[4] that the trial judge had to "quell[] the umbrage" Juror #6 felt toward him;

---

[4] We note that the attorneys engaged in extensive dialogue with Juror #6 during jury selection, and it was clear that Juror #6 would be especially inquisitive:

> State: * * * If the Court tells you that circumstantial evidence and direct evidence have the same probative value, could you return a verdict of guilty without direct evidence? I don't mean to pick on you, [Juror #6], but you seem curious. Maybe, maybe not?

13.

and that there had been a "confrontation" between Juror #6 and the trial judge. Nowhere in the record did the trial court describe Juror #6 as "angry," "confrontational," "combative," or feeling "umbrage." The state has taken unwarranted liberties with the record in describing him as such.

---

Juror #6: Well, I'm just wondering how many questions we could have, say, to ask the judge, aside from the courtroom. If we have questions about what might be circumstantial and what might be perceived, can you clarify this is what we think collectively? As long as I'm able to reference someone for clarification. I would hate to make a decision –
State: Would you be able to draw inferences from facts you find?
Juror #6: Facts, correct, yes.
State: So if there are facts there, you can determine. Are you able to draw the inferences from that?
Juror #6: Yes.
* * *
State: Will you weigh all the evidence and based on that render a verdict? [Juror #6]?
Juror #6: I would have to know everything about everything. As long as all the questions that I have were answered, yes. But I would want to know as much as I could from as many sources as I could.
* * *
Defense counsel: * * * Do you have a problem with the case that there's going to be quite a bit of circumstantial evidence and you're trying to figure out what that all means? I think you said I like to be really clear. Are you going to have a problem sorting all that out if a lot of this case turns out to be circumstantial evidence?
[Juror #6]: If I have the resources to go to, to my satisfaction, and I think reasonable is probably the operative word, then yes, I would be satisfied if I got clarification on any question I might have as to circumstantial evidence, then yes.

If the state felt that Juror #6's inquisitive nature indicated that he would be "combative," the state could have used a peremptory challenge to exclude him from the panel. The state did not use all of its peremptory challenges. Regardless, as discussed above, the judge did not describe Juror #6 as being "combative" when he asked the judge a question in the jury room.

14.

### D. Judicial Bias

{¶ 29} As an initial matter, the state argues that this court lacks jurisdiction "to disqualify a judge or magistrate or to vacate a judgment on the basis of judicial bias." It also claims that a defendant cannot raise judicial bias for the first time on appeal. It is true that "a court of appeals has no authority to hear a disqualification matter or to declare a trial court's judgment void on the basis of judicial bias," however, "'a trial court's judgment may be reversed due to bias if the bias or prejudice violated the defendant's right to due process and deprived the defendant of a fair hearing.'" *State v. Graf*, 2022-Ohio-2169, 191 N.E.3d 539 (2d Dist.) at f.n. 3, quoting *Cleveland v. Goodman,* 8th Dist. Cuyahoga No. 108120, 2020-Ohio-2713, ¶ 15-16. Moreover, Brown objected to the underlying conduct that he claims demonstrated judicial bias, in our view, preserving that error for appeal. *See State v. Gregory*, 4th Dist. Gallia No. 16CA3, 2016-Ohio-7940, ¶ 12, 16 (Harsha, J., concurring) (recognizing that appellate courts routinely address the merits of judicial-bias claims that arise during trial).

{¶ 30} "It is well settled that a criminal trial before a biased judge is fundamentally unfair and denies a defendant due process of law." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 34, citing *Rose v. Clark*, 478 U.S. 570, 577, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). Judicial bias has been described as "'a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by

15.

the law and the facts.'" *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, ¶ 48, quoting *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 132 N.E.2d 191 (1956), paragraph four of the syllabus.

{¶ 31} "If the record evidence indicates that the trial was infected by judicial bias, the remedy is a new trial." *State v. Jackson*, 149 Ohio St.3d 55, 2016-Ohio-5488, 73 N.E.3d 414, ¶ 43, citing *Dean* at ¶ 2. However, "'we presume that a judge is unbiased and unprejudiced in the matters over which he or she presides, and the appearance of bias or prejudice must be compelling in order to overcome the presumption.'" (Citations omitted.) *Graf* at ¶ 16, quoting *Goodman* at ¶ 18. A trial judge's "less-than-model behavior will not rise to the level of bias unless it permeated the trial." (Internal quotations and citations omitted.) *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 76.

{¶ 32} In *Cepec*, for instance, the Ohio Supreme Court found no structural error on the basis of judicial bias, even though the trial judge questioned witnesses, thereby eliciting testimony unfavorable to the defendant. It reasoned that there had been no allegations that the judge's demeanor was hostile, the judge did not appear to be badgering witnesses, the questions often served to clarify previously-offered testimony, and the judge interrupted both attorneys, thereby reducing the appearance of bias.

{¶ 33} In *State v. Dennison*, 10th Dist. Franklin No. 12AP-718, 2013-Ohio-5535, ¶ 48, the Tenth District refused to find judicial bias where the trial judge (1) told defense counsel during a sidebar that it was not the court's duty to instruct him on how to try a

16.

case; (2) outside the presence of the jury, told defense counsel not to touch the jury box because it was a pet peeve of his; (3) outside the presence of the jury, chastised defense counsel for rolling his eyes; (4) responded 'you want to play tough, we can play tough,' after defense counsel complained that he was being treated differently than the state's attorney; (5) allowed the state to re-cross twice, but only allowed defense counsel to re-cross once; and (6) allowed the state to split closing arguments between two prosecutors.

{¶ 34} And in *State v. Lester*, 3d Dist. Putnam No. 12-08-03, 2008-Ohio-6070, ¶ 46, the Third District found no bias in favor of the state where the trial judge called both counsel to the bench, questioned whether the state had proven an element of the offense, and then allowed the state to reopen direct examination to present evidence of the missing element.

{¶ 35} Here, Brown's claim of judicial bias revolves entirely around this one action taken by the trial judge. Brown does not complain about any other rulings and does not otherwise complain about the trial judge's treatment of him or his attorney. All the conversations about Juror #6 took place outside the presence of the jurors. The jurors went into deliberations unaware that Juror #6 had been non-randomly designated an alternate juror and without knowledge that the trial court had taken this action to appease the state. While the trial judge's decision to designate Juror #6 an alternate juror may have been unreasonable because it was done in a manner contrary to the trial judge's usual procedures, under circumstances where it was not shown that the juror was unable to perform his duty, and without the trial court making a finding of juror bias, we cannot

17.

say that this single act demonstrates a compelling appearance of judicial bias that permeated the trial so as to constitute structural error.

{¶ 36} We find Brown's sole assignment of error not well-taken.

### III. Conclusion

{¶ 37} Although it may not have been reasonable for the trial judge to designate Juror #6 an alternate juror in a manner contrary to his usual procedures, under circumstances where it was not shown that the juror was unable to perform his duty, and without the trial court making a finding of juror bias, Brown has failed to demonstrate a compelling appearance of judicial bias in favor of the state or error that rises to the level of a violation of the basic constitutional guarantees that define the framework of a criminal trial. As such, he has not shown that structural error occurred here. We, therefore, find his assignment of error not well-taken.

{¶ 38} We affirm the February 9, 2023 judgments of the Wood County Court of Common Pleas. Brown is ordered to pay the costs of this appeal under App.R. 24.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.     _____
                  JUDGE

Myron C. Duhart, P.J.

                 _____
Charles E. Sulek, J.        JUDGE
CONCUR.

                 _____
                  JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.